**In re SCB COMPUTER TECH-
NOLOGY, INC., SECURI-
TIES LITIGATION.**

No. 00–2343 G/V.

United States District Court,
W.D. Tennessee,
Western Division.

Feb. 15, 2001.

Andrew N. Friedman, Cohen, Milstein, Hausfield & Toll, Washington, DC, George E. Barrett, Douglas S. Johnston, Barrett, Johnston & Parsley, Nashville, TN, David Kessler, Robert B. Weiser, Schiffrin & Barroway, Bala Cynwyd, PA, Paul Kent Bramlett, Law Office of Paul Bramlett, Nashville, TN, Frederic S. Fox, Joel B. Strauss, Janine R. Azriliant, Kaplan, Kilsheimer & Fox, LLP, New York City, Myron M. Cherry, Matthew David Tanner, Cherry & Lehman, Chicago, IL, Kenneth J. Vianale, Maya Saxena, Milberg, Weiss,

Bershad, Hynes & Lerach, LLP, Boca Raton, Paul J. Geller, Cauley & Geller, LLP, Boca Raton, FL, Fred Taylor Isquith, Wolf, Haldenstein, Adler, Freeman & Herz, LLP, New York City, Bruce G. Murphy, Law Office of Bruce Murphy, Vero Beach, FL, Jeffrey C. Block, Glenn Devalerio, Berman, Devalerio & Pease, LLP, Boston, MA, Charles J. Piven, Law Offices of Charles J. Piven, Baltimore, MD, Brian P. Murray, Rabin & Peckel, LLP, New York City, Evan Smith, Brodsky & Smith, LLC, Bala Cynwyd, PA, for Plaintiff.

Jef Feibelman, Douglas F. Halijan, Burch, Porter & Johnson, Memphis, TN, Peter Q. Bassett, Steven M. Collins, Jason N. Poulos, Alston & Bird, Atlanta, GA, for Defendant.

Louis R. Lucas, Lucas, Thompson, Ryan & Sossaman, Memphis, TN, Read K. McCaffrey, Lanny J. Davis, Michael E. Klein, John L. Oberdorfer, Patton & Boggs, LLP, Washington, DC, for Defendant.

Frank J. Glankler, Jr., C. Barry Ward, Glankler & Brown, PLLC, Memphis, TN, Joseph B. Haynes, Michael R. Smith, Cheri A. Grosvenor, King and Spalding, Atlanta, GA, for Defendant.

## ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

GIBBONS, District Judge.

The plaintiffs in these consolidated cases seek damages against defendants SCB Computer Technology, Inc. ("SCB"), Ben C. Bryant, Jr., T. Scott Cobb, Gary E. McCarter, and Ernst & Young LLP ("E & Y") for their alleged securities fraud.[1] Specifically, plaintiffs, who seek to represent a class of purchasers of SCB's common stocks,[2] allege that SCB and the three individual defendants "reported materially false and misleading financial results for the fiscal years ending April 30, 1998, and April 30, 1999," and that "E & Y issued audit reports falsely representing that SCB's financial statements conformed with Generally Accepted Accounting Principles ('GAAP') and that E & Y performed audits of such financial statements in accordance with Generally Accepted Auditing Standards ('GAAS')."[3] (Consol.Am.Compl.("Compl.") ¶ 2.) Plaintiffs bring this action under sections 10(b) and 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b–5, promulgated thereunder by the Securities and Exchange Commission,

---

**1.** In an order entered June 1, 2000, the court consolidated all cases alleging securities fraud against SCB, Bryant, Cobb, McCarter, and E & Y were in one action pursuant to Federal Rule of Civil Procedure 42. Prior to this consolidation, the lead plaintiffs and case numbers were as follows: Margaret Nugent, Case No. 00–2343; Paul Denton, Case No. 00–2345; Robert Beckerle, Case No. 00–2348; Michael L. Mason, Case No. 00–2382; Syed Ahsan Tanvir, Case No. 00–2436; and Huston D. Staley, Case No. 00–2525.

**2.** The proposed class of plaintiffs consists of "persons who purchased the common stock of SCB on the open market during the period between November 19, 1997 and April 14, 2000, inclusive (the 'Class Period') and were damaged thereby." (Consol.Am.Compl.¶ 1.)

**3.** As one district court has explained, "[g]enerally accepted accounting principles ('GAAP') comprise a set of basic postulates and broad accounting principles pertaining to business enterprises. These principles, approved by the American Institute of Certified Public Accountants ('AICPA'), establish guidelines for measuring, recording and classifying the transactions of a business entity. Generally accepted auditing standards ('GAAS') embody the general standards prescribed by the AICPA for the conduct of auditors in the performance of an examination." *Reiger v. Price Waterhouse Coopers LLP*, 117 F.Supp.2d 1003, 1009 (S.D.Cal.2000) (internal citations omitted).

17 C.F.R. § 240.10b–5. The court now considers all defendants' motions to dismiss the case pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted.[4]

The following alleged facts are relevant to defendants' motions to dismiss. SCB, a provider of information technology management and technical services to corporations, state and local governments, and other large organizations, is headquartered in Memphis, Tennessee, and was listed on the NASDAQ Stock Exchange under the symbol "SCBI" during the Class Period. (Compl.¶ 17.)

Bryant, one of SCB's founders, was Vice Chairman of the Board of Directors, President, Chief Executive Officer, and Treasurer of SCB during the Class Period, and he became Chairman of the Board on November 18, 1999. Bryant resigned as Chairman of the Board on July 17, 2000, and on August 21, 2000, SCB announced that Bryant had retired from all positions with SCB. Both his resignation and his retirement were effective September 1, 2000. As of August 13, 1999, Bryant owned, either directly or beneficially, 20.5 percent of SCB's common stock. *Id.* ¶ 18(a).

Cobb, also one of SCB's founders, served as Chairman of the Board of Directors until he resigned on November 18, 1999, and he owned, either directly or beneficially, 18.1 percent of SCB's outstanding common stock as of August 13, 1999. *Id.* ¶ 18(b).

McCarter served as SCB's Chief Financial Officer until September 1999, and he became president of SCB's Enterprise Solutions division in October 1999. McCar-

ter resigned from SCB on August 22, 2000. *Id.* ¶ 18(c).

Bryant, Cobb, and McCarter all signed SCB's Form 10–K for the fiscal years 1998 and 1999, which were filed with the SEC on July 29, 1998, and July 29, 1999, respectively. *Id.* ¶ 18(a), (b), (c). In addition, McCarter signed SCB's Form 10–Q for the quarters ending October 31, 1997, January 31, 1998, July 31, 1998, October 31, 1998, January 31, 1999, and July 31, 1999. *Id.* ¶ 18(c).

E & Y, an international firm consisting of certified public accountants, auditors, and consultants, had the primary responsibility for performing the audits of SCB's financial statements beginning at the end of fiscal year 1996 and continuing until E & Y resigned on April 14, 2000. *Id.* ¶ 23(a), (b). In this capacity, E & Y performed the audits of SCB's financial statements for fiscal years 1998 and 1999. *Id.* ¶ 23(d).

Plaintiffs allege that throughout the class period, SCB engaged in various accounting practices that misstated revenues and expenses in order to inflate the value of its stock. Specifically, the complaint details the following instances of alleged impropriety in connection with SCB's accounting practices, all of which plaintiffs contend violate GAAP. First, plaintiffs allege that in connection with SCB's July 1997 acquisition of Partner's Resources, Inc. ("PRI"), SCB acquired an outsourcing contract which it improperly accounted for as only a services agreement and therefore improperly recognized revenue of $2,482,277 for the fiscal year 1998 fourth quarter. *Id.* ¶ 70(a). SCB corrected this error in its amended 1999 Form 10–K. *Id.*

---

4. Three motions to dismiss are currently pending before the court: one filed by SCB, Bryant and Cobb; one filed by McCarter; and one filed by E & Y. Since these motions to dismiss involve the same factual allegations, the court will consider the motions jointly except where otherwise noted.

Second, plaintiffs allege that for the fiscal year 1999 third and fourth quarters, "SCB improperly recognized $1,650,000 and $936,451 of revenue, respectively, on residual interests in computer equipment leases it sold to [Quest Residual Services, LLC] ('Quest')." *Id.* ¶ 70(b). SCB's amended 1999 Form 10–K represented that although SCB had entered agreements with Quest by January 27, 1999, and April 26, 1999, no contracts had been signed as of these dates or during the affected quarters. *Id.* Third, plaintiffs allege that "the SCB Defendants routinely recognized revenues for SCB in violation of GAAP on purported contracts for computer consulting or the sale of computer equipment where contracts had either not been finalized and/or where the earnings process on the part of SCB had not been completed." *Id.* ¶ 70(c).

On March 27, 2000, five SCB employees approached the audit committee of SCB's Board of Directors with concerns over SCB's accounting practices and the accuracy of its financial statements. *Id.* ¶ 59. In an April 14, 2000 press release, SCB acknowledged that the employees had raised these concerns and announced that SCB was conducting an independent investigation into allegations of accounting irregularities affecting SCB's financial statements. *Id.* ¶¶ 59, 60. Additionally, SCB announced that it would need to restate its audited financial statements for fiscal years 1998 and 1999 and that E & Y had resigned as its auditor. *Id.* ¶ 60.

In a July 3, 2000 press release, SCB confirmed that it would restate its financial statements for fiscal years 1998 and 1999 and the first three quarters of fiscal year 2000. *Id.* ¶ 62. Pursuant to that announcement, SCB filed an Amended Report of Form 10–K for fiscal year 1998 with the SEC on July 20, 2000. *Id.* ¶ 67. Plaintiffs contend that by acknowledging

the need to restate its prior financial reports, "defendants have effectively admitted that the Company's improper recognition of revenue and under reporting of expenses was therefore known or recklessly disregarded at the time all of the foregoing fraudulent financial statements were materially false and misleading." *Id.* ¶ 71.

Furthermore, plaintiffs allege that the individual defendants refused to record certain unspecified adjustments to SCB's financial statements that strict adherence to GAAP would have required, despite E & Y's recommendations, and that E & Y acquiesced in their refusal. *Id.* ¶¶ 33(e), 49(g), 72. Plaintiffs contend that the refusal to record the recommended adjustments served as a "red flag" to E & Y that should have led E & Y to question the integrity of SCB's management and the reliability of its financial statements. *Id.* ¶ 94.

Plaintiffs contend that the individual defendants allowed these accounting irregularities to occur in an effort to meet analysts' estimates for SCB's earnings in each of the relevant quarters and inflate SCB's stock price. *Id.* ¶¶ 26, 27, 29, 31, 34, 37, 40, 43, 80–82. To support this position, plaintiffs allege that Bryant repeatedly emphasized in press releases that the quarterly and annual results were in line with analysts' expectations. *Id.* ¶¶ 27, 29, 31, 44, 80. Additionally, plaintiffs maintain that the individual defendants had access to the information that enabled SCB to misstate its revenues, thereby demonstrating their awareness of and participation in the allegedly fraudulent statements. *Id.* ¶¶ 75–77. Plaintiffs contend that the individual defendants sought to inflate SCB's stock price "in order to fund additional acquisitions with as little dilution as possible to the Individual Defendants' own holdings as possible." *Id.* ¶¶ 84.

Plaintiffs also allege that SCB's response to and settlement of an investigation conducted by the United States Attorney's Office for the Western District of Tennessee into allegations of fraudulent billing in connection with SCB's contract with the Tennessee Valley Authority ("TVA") was "indicative of the SCB Defendants' actual knowledge and/or reckless disregard of the fraudulent accounting practices taking place at SCB." *Id.* ¶ 38. Plaintiffs contend that if SCB had thoroughly reviewed its contract procedures, as Bryant said it would do, the individual defendants would have discovered SCB was recording revenue prematurely. *Id.* ¶¶ 37–38. Plaintiffs further allege that the TVA incident should have served as a "red flag" and led E & Y to question the integrity of SCB's management and the veracity of its representations. *Id.* ¶¶ 88–92.

As a final example of SCB's allegedly false and misleading statements, plaintiffs focus on a January 20, 1999 press release in which SCB announced that it had been awarded contracts with the Arkansas Department of Information Systems ("ADIS"), the Mississippi Department of Education, a major university, and a major telecommunications corporation, that exceeded $50 million. *Id.* ¶ 55–57, 74. Plaintiffs contend that the press release was false and misleading because its contract with ADIS, which SCB valued at up to $26 million, was one of five contracts ADIS awarded to different vendors for which ADIS' entire budget was $26.3 million. *Id.* ¶ 56. Plaintiffs maintain that the recognition of this error in a July 3, 2000 press release, and an acknowledgment in that same press release that doubts existed concerning the contract with a telecom company, demonstrate that the individual defendants knew or recklessly disregarded the truth when they initially announced the contracts in January 2000 press release. *Id.* ¶¶ 56–57. Furthermore, plain-

tiffs contend that the individual defendants failed to reveal that the maximum amount payable under the contract with the Mississippi Department of Education was $3.2 million. *Id.* ¶ 57.

Finally, plaintiffs contend that E & Y made false and misleading statements when it represented that it performed its audits in a manner consistent with GAAS. *Id.* ¶ 98. In support of this allegation, plaintiffs note that E & Y performed its audits for fiscal years 1998 and 1999 and represented that the financial statements were fair and accurate and comported with GAAP despite the "red flags" from the TVA inquiry and settlement and SCB's refusal to record the adjustments it recommended. *Id.* ¶¶ 35, 51, 98–102. In addition, plaintiffs insist that E & Y had complete access to SCB's documents, employees, contracts, and records, yet "knew or recklessly disregarded that contrary to GAAP, SCB had been improperly recognizing or accelerating recognition of revenue on purported transactions and failing to record material amounts of expenses." *Id.* ¶ 96. Specifically, plaintiffs allege that E & Y reviewed SCB's contracts with PRI and Quest yet failed to recognize or acknowledge that SCB was improperly recognizing revenue associated with these contracts. *Id.* ¶ 93. Plaintiffs maintain that E & Y's performance as auditor was not "a mere misapplication of accounting principles" but rather "was so deficient that it amounted to no audit at all." *Id.* ¶ 97.

In considering a Rule 12(b)(6) motion to dismiss, the court is limited to examining whether the complaint sets forth allegations sufficient to make out the elements of a cause of action. *Windsor v. The Tennessean*, 719 F.2d 155, 158 (6th Cir.1983). The court must "construe the complaint liberally in the plaintiff's favor and accept as true all factual allegations and permissi-

ble inferences therein." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *In re Comshare Inc. Sec. Litig.,* 183 F.3d 542, 547 (6th Cir.1999). "In order for dismissal to be proper, it must appear beyond doubt that the plaintiff would not be able to recover under any set of facts that could be presented consistent with the allegations of the complaint." *Bower v. Federal Express Corp.,* 96 F.3d 200, 203 (6th Cir.1996).

■ Although the standards for withstanding motions to dismiss under Rule 12(b)(6) are quite liberal, "more than bare assertions of legal conclusions is ordinarily required to satisfy federal notice pleading requirements." *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988). Pursuant to this requirement, "a complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Id.*

■ Five elements are necessary to state a claim under section 10(b) and Rule 10b–5: 1) a defendant's misstatement or omission of a material fact, 2) in connection with the purchase or sale of securities, 3) scienter on the part of the defendant, 4) justifiable reliance on the misstatement or omission by the plaintiff, and 5) proximately caused damages. *In re Comshare,* 183 F.3d at 548. With respect to these motions, the central dispute is whether plaintiffs have sufficiently alleged that defendants acted with the requisite mental state or scienter. As the Court of Appeals for the Sixth Circuit has emphasized, "[t]o establish a defendant's liability under § 10(b), a plaintiff must, as a threshold matter, allege in his complaint that the defendant acted with sufficient scienter." *Id.* Scienter is a "mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

■ Like all cases in which fraud is an element of the cause of action, allegations of securities fraud must satisfy Rule 9(b) of the Federal Rules of Civil Procedure. *In re Comshare,* 183 F.3d at 548. Pursuant to Rule 9(b), in any complaint averring fraud or mistake, "the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R.Civ.P. 9(b). To satisfy this requirement, a plaintiff must "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Coffey v. Foamex,* 2 F.3d 157, 161–62 (6th Cir.1993) (internal quotations and citations omitted); *see also Michaels Bldg. Co. v. Ameritrust Co., N.A.,* 848 F.2d 674, 679 (6th Cir.1988) (noting that the particularity requirement of Rule 9(b) is designed "to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading"). Since any claim under section 10(b) involves an allegation of fraud in connection with the scienter requirement, the requirements for pleading fraud under Rule 9(b) and for stating a claim under section 10(b) must be considered together.

■ Congress addressed the pleading requirements for securities fraud cases in the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See* Pub.L. No. 194–67, 109 Stat. 743, codified at 15 U.S.C. § 78u–4(b). Prior to enactment of the PSLRA, the United States Supreme Court recognized that "litigation under Rule 10b–5 presents a danger of vexatiousness different in degree and kind from that which accompanies litigation in general." *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 739, 95 S.Ct. 1917, 44 L.Ed.2d

539 (1975).[5] These concerns also motivated Congress to enact the PSLRA: "Congress echoed the concerns expressed by the Supreme Court in *Blue Chip*, noting that frivolous securities fraud litigation 'unnecessarily increase[s] the cost of raising capital and chill[s] corporate disclosure, [and is] often based on nothing more than a company's announcement of bad news, not evidence of fraud.'" *In re Comshare*, 183 F.3d at 548 (alterations in original) (quoting S.Rep. No. 104–98 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 690). In an attempt to address these concerns, the PSLRA imposes two additional requirements on complaints alleging violations of section 10(b). First, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Second, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u–4(b)(2). Furthermore, the PSLRA mandates that district courts "shall, on the motion of any defendant, dismiss the complaint if the requirements of [§ 78u–4(b)(1) and (2) ] are not met." *Id.* at § 78u–4(b)(3)(A). As these requirements suggest, the PSLRA imposes even more stringent pleading requirements on plaintiffs than Rule 9(b) requires. *Weber v. Contempo Colours, Inc.*, 105 F.Supp.2d 769, 772 (W.D.Mich.2000); *Caprin v. Simon Transp. Services*, 112 F.Supp.2d 1251, 1255 (D.Utah 2000).

■ In considering the PSLRA's second requirement, the Court of Appeals for the Sixth Circuit has explained, "plaintiffs may plead scienter in § 10b or Rule 10b–5 cases by alleging facts giving rise to a strong inference of recklessness, but not by alleging facts merely establishing that a defendant had the motive and opportunity to commit securities fraud." *In re Comshare*, 183 F.3d at 549. In the context of securities fraud litigation, recklessness is "a mental state apart from negligence and akin to conscious disregard." *Id.* at 550 (noting that courts allowing recklessness to satisfy the scienter requirement "have relied on a stringent formulation of 'recklessness' that does not allow for recklessness as a form of negligence"). As the Court further explained in *In re Comshare*, "recklessness [as it relates to securities fraud litigation is] highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it." *Id.* (internal quotations and citations omitted).

---

**5.** The Supreme Court based this conclusion on two factors. First, "even a complaint which by objective standards may have very little chance of success at trial has a settlement value to the plaintiff out of any proportion to its prospect of success at trial so long as he may prevent the suit from being resolved against him by dismissal or summary judgment. The very pendency of the lawsuit may frustrate or delay normal business activity of the defendant which is totally unrelated to the lawsuit." *Blue Chip*, 421 U.S. at 740, 95 S.Ct. 1917. Second, "[t]he potential for possible abuse of the liberal discovery provisions of the Federal Rules of Civil Procedure may likewise exist in this type of case to a greater extent than they do in other litigation ... [T]o the extent that [extensive discovery] permits a plaintiff with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the process will reveal relevant evidence, it is a social cost rather than a benefit." *Id.* at 741, 95 S.Ct. 1917.

One court has explained its view of the PSLRA's requirements in this way:

> Taken together, it appears that in order to satisfy the heightened pleading standard under the PSLRA, a plaintiff must state facts that, if true, would compel or forcefully suggest the conclusion that a given defendant acted with the required state of mind. A plaintiff need not disprove every conceivable rationale a defendant might put forward to explain why a particular statement was made. However, if the facts alleged do not exclude other plausible explanations that would undercut a plaintiff's circumstantial inference of scienter, then that plaintiff's facts cannot be fairly said to raise a "strong inference" that the defendant acted with the required state of mind.

*Bryant v. Avado Brands, Inc.*, 100 F.Supp.2d 1368, 1376 (M.D.Ga.2000).

▇▇▇ In addition, when a plaintiff files a securities fraud action against multiple defendants, the complaint must allege specific claims against each defendant that satisfy Rule 9(b) and the PSLRA. *Weber*, 105 F.Supp.2d at 772; *In re Baan Sec. Litig.*, 103 F.Supp.2d 1, 16, 20 (D.D.C. 2000) (noting that plaintiffs must allege that each defendant made a material misleading statement or omission and that the complaint must plead scienter as to each defendant). In their complaint, plaintiffs attempt to rely on the "group pleading doctrine" to state their claims against the individual defendants. (Compl.¶ 20.) Pursuant to the "group pleading" or "group publication" doctrine, "plaintiffs may rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information are the collective work of those individuals with direct involvement in the everyday business of the company." *In re Stratosphere Corp. Sec. Litig.*, 1 F.Supp.2d 1096, 1108 (D.Nev.

1998) (internal quotations and citations omitted); *Berry v. Valence Tech., Inc.*, 175 F.3d 699, 706 (9th Cir.1999). Defendants argue that the group pleading doctrine is no longer viable after the PSLRA. Courts faced with this question have reached different conclusions. *Compare Coates v. Heartland Wireless Communications, Inc.*, 26 F.Supp.2d 910, 916 (N.D.Tex.1998) (refusing to apply the group pleading doctrine in light of the PSLRA's heightened pleading requirements) *with Berry*, 175 F.3d at 706 (holding that the group pleading doctrine applies to outside directors if plaintiffs make specific allegations indicating that the outside directors "either participated in the day-to-day corporate activities, or had a special relationship with the corporation, such as participation in preparing or communicating group information at particular times") (quoting *In re GlenFed Sec. Litig.*, 60 F.3d 591, 593 (9th Cir.1995)), *and In re Baan*, 103 F.Supp.2d at 17–18 (permitting plaintiffs to use the group pleading doctrine provided that they "identify the roles of the individual defendants, and describe their involvement, if any, in preparing the misleading statements"), *and In re Sunbeam Sec. Litig.*, 89 F.Supp.2d 1326, 1340–41 (S.D.Fla.1999) (allowing group pleading doctrine under the PSLRA in the limited circumstances in which it applies), *and In re Stratosphere*, 1 F.Supp.2d at 1108 (allowing for group pleading in a securities fraud case where plaintiffs alleged that all of the individual defendants, due to their high-level positions with the corporation, were involved in the corporation's daily operations, were privy to confidential information, directly participated in managing the corporation, and were involved in drafting, reviewing, and/or disseminating the false and misleading statements). The Court of Appeals for the Sixth Circuit has not addressed the continued viability of the group pleading doctrine in securities fraud

litigation under the PSLRA. As the remainder of this order indicates, moreover, there is no reason for this court to decide this issue.

▮ As an initial matter, several of plaintiffs' allegations fail to support a finding that defendants acted with scienter. First, plaintiffs devote significant attention to the alleged failure of E & Y to follow GAAP. However, a defendant's failure to follow GAAP or publication of inaccurate accounting figures, without any additional evidence of scienter, is insufficient to state a claim for securities fraud. *In re Comshare*, 183 F.3d at 553; *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1020–21 (5th Cir.1996). Second, plaintiffs allege that the fact that defendants restated SCB's financial statements for fiscal years 1998 and 1999 show that the previous erroneous, misleading statements were made knowingly or with reckless disregard for their truth. This allegation fails as a matter of law: "[p]laintiffs' claim that a subsequent revelation of the falsehood of previous statements lacks merit, since mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *In re Comshare*, 183 F.3d at 553 (internal quotations and citations omitted).

Plaintiffs base their allegations that SCB and the individual defendants acted with scienter on four grounds. First, they contend that the nature, degree, and pervasiveness of the GAAP violations support a strong inference of scienter. Second, they argue that the magnitude of SCB's restated financial statements supports a strong inference of scienter. Third, plaintiffs claim that the January 20, 2000 press release raises a strong inference that the individual SCB defendants acted with scienter. Finally, plaintiffs maintain that the individual defendants had a motive and opportunity to engage in fraud.

▮ In presenting the circumstances of SCB's alleged violations of GAAP, plaintiffs' complaint focuses on several allegations of improper procedures. The complaint alleges improper revenue recognition for each quarterly report from the second quarter of fiscal year 1998, in October 1997, until the fourth quarter of fiscal year 1999, in April 1999:

26. ... SCB's reported financial results for the second quarter ended October 31, 1997 were materially false and misleading. Indeed, the SCB Defendants overstated SCB's revenues for the quarter by more than $793,000. Of this amount, at least $589,998 related to the improper recognition of revenue on purported sales of computer equipment that had not yet been consummated. The SCB Defendants knew or recklessly disregarded that the sales of the computer equipment, including the transfer of titles, had not yet taken place and, therefore, revenue recognition was prohibited under numerous provisions of GAAP, including Statement of Financial Accounting Standards ("SFAS") Concepts No. 5 and provisions set forth in ¶ 68, *infra* . . .

29. ... SCB's reported financial results for its third fiscal quarter ended January 31, 1998 were materially false and misleading. Indeed, for this quarter, the SCB Defendants had improperly recognized more than $886,000 in revenue in violation of GAAP. Of this amount, at least at least $300,000 related to the improper recognition of revenue on purported sales of computer equipment that had not yet been consummated. The SCB Defendants knew or recklessly disregarded that the computer equipment sales, and the related transfer of title, had not yet taken place and, therefore, revenue recognition was prohibited under numerous provisions of

GAAP, including SFAS Concept No. 5 and provisions set forth in ¶ 68, *infra. . . .*

33. SCB's reported financial results for the fourth fiscal quarter and year-ended April 30, 1998 were false and the product of at least the following fraudulent accounting manipulations which violated GAAP:

(a) As more fully explained at ¶ 70, *infra,* in connection with an outsourcing contract SCB acquired from PRI in July, 1997 (and which was subsequently modified in April 1998), the SCB Defendants, in knowing or reckless disregard of the terms of such contract and the revenue recognition rules applicable thereto under GAAP, caused SCB to improperly recognize $2,695,439 and $3,174,812 of revenue for the fourth quarter and year ended April 30, 1998, respectively;

(b) With knowing or reckless disregard of the terms of agreements to lease computer equipment by and between SCB and certain customers, the SCB Defendants caused SCB to improperly recognize revenue of $246,573 for the year ended April 30, 1998;

(c) With knowing or reckless disregard of terms of consulting agreements with certain customer and/or knowledge or reckless disregard that certain agreements had not been finalized, the SCB Defendants caused SCB to improperly recognize revenues of $133,364 which had not been earned during the year ended April 30, 1998;

(d) The SCB Defendants knowingly or recklessly caused SCB to under accrue liabilities SCB had incurred for health insurance, legal fees and subcontractor costs by at least $114,829 for the year ended April 30, 1998,

thereby understating these expenses; and

(e) The SCB Defendants knowingly refused to cause SCB to record adjustments to the Company's financial statements proposed by E & Y. As a result, SCB overstated revenues by an additional $135,000 and understated expenses by an additional $79,500 for the year ended April 30, 1998.

40. SCB's financial results for the first quarter ended July 31, 1998 were materially false and misleading and achieved through fraudulent accounting including, but not limited to, the overstatement of revenue for the quarter of more than $884,000. These accounting manipulations violated GAAP, including the provisions thereof set forth at ¶ 68, *infra. . . .*

43. SCB's reported financial results for its fiscal second quarter ended October 31, 1998 were, as in prior quarters, achieved by, among other things, the overstatement of revenues for the quarter by more than $362,000. These accounting manipulations violated GAAP, including the provisions thereof set forth at ¶ 68, *infra. . . .*

46. SCB's reported financial results for the third fiscal quarter ended January 31, 1999 were materially false and misleading. Indeed, in clear violation of GAAP, the SCB Defendants overstated SCB's revenues for the quarter by more than $1,877,000. Of this, at least $1,650,000 of revenue was improperly recognized on unexecuted contracts relating to the sale of computer equipment leases to Quest. The SCB defendants knew or recklessly disregarded that SCB had no contract with Quest and that recognition of revenue for the quarter was therefore prohibited by GAAP, including, but not limited to the provisions set forth at ¶ 68, *infra. . . .*

49. SCB's materially false and misleading financial results for its fiscal fourth quarter and year ended April 30, 1999 were the product of at least the following fraudulent accounting manipulations which violated GAAP:

(a) The SCB Defendants improperly recognized revenue of at least $2,586,451 in the fiscal year ended April 30, 1999 on a purported contract to sell residual interests in computer equipment leases to Quest even though such contracts were not executed;

(b) SCB sold a 15% interest in certain leased computer equipment yet, in clear violation of the terms of the transaction, and in violation of GAAP, recognized revenue as if it had sold 100% of the equipment. As a result, the SCB Defendants overstated revenue by an additional $180,000 in the fourth quarter and fiscal year ended April 30, 1999;

(c) The SCB Defendants knowingly or recklessly caused the Company to understate SCB's expenses by at least $380,000 in the fourth quarter and fiscal year ended April 30, 1999 by failing to record bonuses paid to two of its employees;

(d) With knowing or reckless disregard of the terms of the agreements SCB had to lease computer equipment to certain customers, the SCB Defendants caused the Company to improperly recognize revenue SCB had not yet earned in the amount of $709,718 for the year ended April 30, 1999;

(e) With knowing or reckless disregard of the terms of consulting agreements with certain customers and/or knowledge or reckless disregard that certain agreements had not been finalized, the SCB Defendants caused the Company to improperly recognize rev-

enue of $200,011 for the year ended April 30, 1999;

(f) The SCB Defendants knowingly or recklessly caused the Company to under accrue liabilities SCB had incurred for health insurance, legal fees and subcontractor costs by at least $746,509 and $872,134, for the fourth quarter and fiscal year ended April 30, 1999, thereby understating these expenses;

(g) The SCB Defendants caused the Company to knowingly refuse to record adjustments to the Company's financial statements proposed by E & Y. As a result, the SCB Defendants overstated SCB's revenues by $75,000, understated direct costs of $276,000 and understated its selling, general and administrative expenses by $165,000 for the year ended April 30, 1999.

70. Throughout the Class Period, as demonstrated by the following examples, SCB improperly recorded revenues on a routine basis in complete disregard of the terms of the contracts, the facts that contracts had not yet even been executed by customers and the requirements of GAAP.

(a) In connection with its acquisition of PRI in July 1997, SCB acquired an outsourcing contract which was improperly accounted for as only a services agreement. In connection with this contract, the SCB Defendants, knowingly or in reckless disregard of the terms of the acquired contract, which SCB and the customer modified on April 1, 1998, improperly recognized revenue for the fiscal fourth quarter and year-end April 30, 1998 of $2,482,277. As admitted by the Company in the Amended 1999 Form 10–K, the terms of the original and modified contracts made clear that the con-

tracts contained multiple elements and therefore, under GAAP, required revenue to be recognized in amounts far less than what the Company had originally reported. The original contract contained a services agreement and a direct financing lease for assets acquired at the time of execution of the original contract. The modified contract also included two elements: a services agreement and an operating lease for equipment that was purchased by the Company to replace equipment under the original contract. As reported in the Amended 1999 Form 10–K:

[T]he Company has determined that the revenue of $2,482,277 and the related write-off of software of $578,500 recorded in the fourth quarter of fiscal 1998 was prematurely recognized and has been reversed. Accordingly, the Company has determined that the accounting for the original contract in fiscal 1998 and the accounting for the modified contract in fiscal 1999 should be changed. The original contract is accounted for as a services agreement and a direct financing lease in fiscal 1998, and the modified contract is accounted for as a services agreement and an operating lease in fiscal 1999. Essentially, by ignoring the terms of these significant contracts, the SCB Defendants improperly front-ended and recognized millions of dollars of revenue which SCB had not yet earned, causing revenues and related income to be materially overstated as set forth in ¶ 33(a), *supra*.

(b) As noted in ¶¶ 46 and 49(a), *supra*, in SCB's fiscal third and fourth quarters of 1999, SCB improperly recognized $1,650,000 and $963,451 of revenue, respectively, on residual interests in computer equipment leases it sold to Quest. With respect to these transactions, the Company represented in its Amended 1999 Form 10–K, that although there were documents reflecting purported agreements between SCB and Quest as of January 27, 1999 and April 26, 1999, no contracts between the parties had been signed as of these dates or during SCB's fiscal third and fourth quarters of 1999. Therefore, revenue recognition was absolutely prohibited on these supposed "deals" for the third and fourth fiscal quarters of 1999.

(c) As noted in ¶¶ 33 and 49, supra, the SCB Defendants routinely recognized revenues for SCB in violation of GAAP on purported contracts for computer consulting or the sale of computer equipment where contracts had either not been finalized and/or where the earnings process on the part of SCB had not been completed.

(Compl. ¶¶ 26, 29, 33, 40, 43, 46, 49, 70.) Of these allegations, the only ones pled with sufficient particularity to satisfy Rule 9(b) and the PSLRA relate to the improper revenue recognition policies for the PRI and Quest contracts. The remaining allegations simply fail to provide sufficient information relating to the contracts, the revenue recognition errors, or the understated expenses. *See Chalverus v. Pegasystems, Inc.*, 59 F.Supp.2d 226, 233 (D.Mass.1999) (noting that "a securities fraud plaintiff adequately pleads financial fraud based on improper revenue recognition by alleging some particular transaction in which revenues were improperly recorded, the name of the customer, the terms of the specific transaction, when the transaction occurred, and the approximate amount of the fraudulent transaction"); *In re Ancor Communications*, 22 F.Supp.2d 999, 1003 (D.Minn.1998) (recognizing that pleading fraud with sufficient particularity under the PLRSA requires identifying the

who, what, when, where, and how pertaining to allegedly fraudulent conduct).

Recognizing that violations of GAAP without more fail to support a strong inference of scienter, plaintiffs contend that these allegations demonstrate more than a mere violation of GAAP, but that their nature and degree support a strong inference of scienter. In certain situations, courts have allowed circumstances surrounding GAAP violations to contribute to a strong inference of scienter. *See, e.g., In re MicroStrategy, Inc. Sec. Litig.*, 115 F.Supp.2d 620, 636–40 (E.D.Va.2000) (noting that the magnitude of the restated financial statements, the pervasiveness and repetitiveness of the GAAP violations, the simplicity of the accounting principles involved, and the importance of the contracts involved contributed to a strong inference of scienter); *Chu*, 100 F.Supp.2d at 838 (noting that although bare allegations of GAAP violations fail to raise a strong inference of scienter, allegations concerning the magnitude of the accounting error, the defendants' prior notice of the error, and the defendants' role in calculating and disseminating the financial information can support an inference that defendants acted with scienter); *Bell v. Fore Systems, Inc.*, 17 F.Supp.2d 433, 440 (W.D.Pa.1998) (finding that plaintiffs' allegations that defendants knowingly "engaged in an inventory parking scheme with certain distributors to fraudulently conceal the deteriorating state of the Company's business and to artificially inflate its financial statements, engaged in improper accounting practices in violation of GAAP for purposes of revenue recognition, and released a false and misleading statement concerning the Company's participation in an aborted project with Keio University in Japan" "give rise to a strong inference of knowing or conscious behavior" necessary to support a strong inference of scienter); *In re Ancor*, 22 F.Supp.2d at 1005–06 (holding that

plaintiffs plead sufficient facts to support a strong inference of scienter where defendants allegedly engaged in improper revenue recognition practices in violation of GAAP in order to meet analyst expectations, represented in SEC filings that financial results were prepared in accordance with GAAP, and that defendants sold their shares of company's stock during the class period); *Gross v. Medaphis Corp.*, 977 F.Supp. 1463, 1472 (N.D.Ga. 1997) (holding that plaintiffs' allegations that defendants knowingly made false and misleading statements about the progress of its major projects and improperly recognized revenue in violation of GAAP as part of a scheme to inflate the value of the company's stock in order to acquire companies and continue a strategy of growth by acquisition plead sufficient facts to support a strong inference of scienter); *see generally, Chalverus*, 59 F.Supp.2d at 234 (observing that "the Court must determine whether the alleged GAAP violations, combined with other circumstances indicative of fraudulent intent, raise a strong inference that the defendants acted with scienter").

Each of these cases, as well as other cases in which circumstances surrounding GAAP violations contribute to a strong inference of scienter, however, contains significant factors that are not present in this case. First, the complaint in this case includes no allegations of insider sales. *Cf. In re MicroStrategy*, 115 F.Supp.2d at 643–47 (noting that the circumstances surrounding insider sales by individual defendants at least lend some support to the inference of scienter); *In re Ancor*, 22 F.Supp.2d at 1006 (focusing on the presence of insider sales as a factor supporting a strong inference of scienter); *Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir.1996) (noting that insider trading at suspicious times or in suspicious amounts may be

probative of scienter). This factor actually negates an inference of scienter. *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425 (9th Cir.1994); *In re CIENA Corp. Sec. Litig.*, 99 F.Supp.2d 650, 663 (D.Md.2000); *In re Credit Acceptance Corp. Sec. Litig.*, 50 F.Supp.2d 662, 677 (E.D.Mich.1999) ("It seems unlikely that Foss [defendant] would engage in a scheme to inflate the company's earnings after he sold his stock early on in the class period, and yet fail to sell any of his remaining shares at 'artificially inflated prices.' ").

Second, the revenue associated with the PRI and Quest contracts recognized in the third and fourth quarter were nowhere near the magnitude of improperly recognized revenues in other cases. Specifically, SCB's revenue for fiscal years 1998 and 1999, as amended, was $105,722,000, and $152,016,000, respectively. (Fiscal Year 2000 Form 10–K). As a result of SCB's restatement of its financial statements, the revenue for fiscal years 1998 and 1999 decreased by $3,749,749 and $4,654,372, respectively, and the revenue for the third and fourth quarters of fiscal year 1999 decreased by $1,877,013 and $1,529,693, respectively. *Id.* The complaint is inconsistent in terms of the extent to which the PRI and Quest contracts contributed to these restated figures. Plaintiffs allege that the PRI contract involved improperly recognized revenue in fiscal year 1998 of $2,482,277 (Compl.¶ 70(a)), or of $2,695,439 and $3,174,812 for the fourth quarter and year ended April 30, 1998, respectively. *Id.* ¶ 33(a). Similarly, plaintiffs allege that the Quest contract involved improperly recognized revenue for fiscal year 1999 of $2,586,451 (*id.* ¶ 49(a)), or of $1,650,000 and

$963,451 in SCB's fiscal third and fourth quarters of 1999, respectively. *Id.* ¶ 70(b). At most, the PRI contract led to SCB's misstating its revenue for fiscal year 1998 by 2.9 percent,[6] and the Quest contract lead to SCB's misstating its revenue for fiscal year 1999 by 1.65 percent.[7] *Cf. Chalverus*, 59 F.Supp.2d at 234 (noting that the total amount by which defendant restated its revenue for the quarter equaled 158 percent of its actual revenue for the quarter); *In re MicroStrategy*, 115 F.Supp.2d at 636 (noting that complaint alleged that defendant overstated revenues by $66 million over a three year period, and that the accounting errors led to shifting from a reported net income of $18.9 million to a net loss of more than $36 million for the period). Therefore, the magnitude of SCB's allegedly improper revenue recognition with regard to the PRI and Quest contracts fails to contribute to a strong inference of scienter.

The third distinction between the present case and cases where circumstances surrounding GAAP violations support a strong inference of scienter is that the complaint includes no allegations that either the PRI or the Quest contract was a major contract upon which the company's entire financial statement rested. *Cf. In re MicroStrategy*, 115 F.Supp.2d at 638–39 (noting that the complaint alleged that defendant violated GAAP with respect to three of its most important contracts: one accounted for "approximately 50% of MicroStrategy's reported license revenues for that quarter and for all of the revenue and earnings growth the Company purportedly saw for that quarter—and was characterized as a 'watershed event' in MicroStrategy's history by analysts," and the other

---

6. This figure reflects the following calculation: $3,174,812 is 2.9% of the total revenue originally reported for fiscal year 1998 ($105,722,000 plus $3,749,749).

7. This figure reflects the following calculation: $2,586,451 is 1.65% of the total revenue originally reported for fiscal year 1999 ($152,016,000 plus $4,654,372).

two accounted for approximately 25% of the company's revenue for the quarter in which they were reported). As demonstrated above, moreover, the revenue related to the PRI and Quest contracts, when compared to SCB's total revenue for the relevant financial periods, belies any attempt to characterize the PRI or Quest contracts as major balance sheet items of tremendous magnitude.[8]

Fourth, SCB's contracts with PRI and Quest were not contingent upon some future occurrence or consignment transactions in which the other party had no obligation to pay SCB the amount recorded as revenue. *Cf. In re Ancor*, 22 F.Supp.2d at 1004–05 (noting that the complaint alleged that defendant convinced its customers to accept inventory that they had no obligation to purchase and that they had not sold to other customers (consignment transactions) in order to inflate its revenue for particular financial periods); *Bell*, 17 F.Supp.2d at 437 (noting that improper revenue recognition practices included recording revenue from a scheme of inventory parking pursuant to which defendants induced its distributors or resellers to place fictitious orders for its products or to accept receipt of products that they had not agreed to purchase in exchange for future discounts); *Gross*, 977 F.Supp. at 1466–67 (noting that defendant "aggressively enlisted major customers, and included revenue from these contracts in its fourth quarter earnings, only to provide these customers with secret side letters relieving them of their obligations un-

der their agreements" and that defendants recognized revenue from a contract even though the contract was subject to numerous contingencies and the defendant's subsidiary responsible for performing under the contract "was experiencing severe performance problems and was unable to perform under the contract"). Equally important, the complaint's only reference to SCB's internal policies does not indicate how, if at all, SCB's revenue recognition violated its polices.[9] *Cf. Provenz*, 102 F.3d at 1490 (noting that defendants' violation of the company's own policies when recognizing revenue for certain transactions supported an inference of scienter); *Chalverus*, 59 F.Supp.2d at 234–35 (noting defendant's violation of internal revenue recognition policy contributed to an inference of scienter).

In addition to differentiating this case from cases in which circumstances surrounding GAAP violations allowed for a strong inference of scienter, these differences indicate that SCB's alleged GAAP violations lack the circumstances necessary to transform them from mere violations of accounting procedures into evidence from which it is possible to draw a strong inference of scienter. Even when all inferences are drawn in favor of plaintiffs, the complaint's allegations concerning the improper revenue recognition procedures associated with the Quest and PRI contracts fail to allow for a strong inference that SCB and the individual defendants engaged in behavior that represented a knowing at-

---

**8.** Any attempt to attribute significance to the contracts based on their role in allowing SCB to meet analysts' expectations for particular quarters or fiscal years requires an emphasis on defendants' motives and opportunities to commit fraud, which the Sixth Circuit prohibits. *In re Comshare*, 183 F.3d at 549.

**9.** The Complaint's only reference to SCB's revenue recognition policy appears in the fol-

lowing excerpt from SCB's 1998 Form 10–K: "The Company recognizes revenues as professional services are performed. The Company records deferred revenue for payments received from certain customers on service contracts prior to the performance of services required under the service contract." (Compl.¶ 32.)

tempt to deceive the public, or the type of recklessness that is "akin to conscious disregard" and constitutes "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *In re Comshare,* 183 F.3d at 550.

 Plaintiffs' second basis to support their contention that the individual defendants acted with scienter relates to the magnitude of SCB's restated financial statements. As mentioned above, however, "mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *Id.* at 553 (internal quotations and citations omitted). Plaintiffs' attempt to distinguish this barrier to their complaint by focusing on the magnitude of the restatement fails. Most importantly, the magnitude of the financial restatement, without more, fails to indicate that the earlier financial statements were made with an intentional or reckless state of mind at the time they were made. As the previous analysis of the allegedly improper revenue recognition practices indicates, plaintiffs' complaint fails to provide sufficient facts to support a strong inference of scienter in connection with SCB's allegedly improper revenue recognition. Allowing for a strong inference of scienter from restated financial results when the practices leading to the original financial results fail to support a strong inference of scienter would be equivalent to building a house without a foundation.

 Third, plaintiffs claim that the January 20, 2000 press release raises a strong inference that the individual SCB defendants acted with scienter. The complaint describes this press release as follows:

> 55. On January 20, 2000, the SCB Defendants issued a press release announcing that SCB was "awarded contracts exceeding $50 million." According to

the press release, the Arkansas State Department of Information Systems ("ADIS") had awarded SCB a contract, valued at "up to $26 million", to provide ADIS with Information Technology professionals. The press release reported that other contracts reportedly included in the $50 million included contracts with: 1) the Mississippi State Department of Education; 2) a major university; 3) and a major telecommunications corporation. Commenting on the ADIS contract, the SCB Defendants stated:

> SCB was awarded the contract by the state of Arkansas after an extensive and competitive qualification process. The Company was selected based on its expertise and reputation for providing highly qualified and cost-effective IT professionals. Under the terms of the contract, SCB will provide the state of Arkansas with the services of 24 classifications of personnel. SCB's contract with the state of Arkansas extends through June 30, 2001.

> 56. The characterization of the contracts mentioned in the press release were materially false and misleading when made. Indeed, the SCB Defendants had no basis for the representation that SCB was "awarded contracts exceeding $50 million." In fact, at the time of the announcement, the SCB Defendants knew and/or recklessly disregarded that the purported contract between SCB and ADIS was merely one of five contracts awarded to different vendors chosen by ADIS to perform professional services and that ADIS had a total overall authorized budget of $26.3 million for all five of the awarded contracts. Moreover, the ADIS contract contemplated that the vendors would make awards for each job classification on a competitive basis. Far from being

the reported $26 million deal, SCB revealed in a July 3, 2000 press release what the SCB Defendants knew or recklessly disregarded when the ADIS deal was announced—that "[i]t is doubtful that SCB or any other vendor will perform all of the services or will receive the full amount of authorized compensation."

57. Similarly, the SCB Defendants knew or recklessly disregarded the truth when the Company announced that SCB's contract with a "major telecom company" would yield part of the $50 million in fees. In fact, also admitted in the July 3, 2000 press release, SCB had only performed a nominal amount of services under the contract, and it was "doubtful that SCB will [would] receive the full amount of compensation ..." The SCB Defendants also misrepresented the contract with the Mississippi Department of Education, as they failed to reveal that the maximum amount payable to SCB under that contract was approximately $3.2 million. Accordingly, the SCB Defendants had no basis to represent on January 20, 2000 that SCB had been awarded $50 million in new contracts. The SCB Defendants knew, or recklessly disregarded, the terms of the ADIS contract, as well as the limitations on the other contracts which reportedly totaled $50 million. The SCB Defendants chose to conceal the true worth of the contracts in order to maintain the artificially inflated price of SCB's common stock during the Class Period.

(Compl.¶¶ 55–57.) The complaint addresses the manner in which this press release contributes to an inference of scienter as follows:

A strong inference of scienter can also be inferred on the part of the SCB Defendants based on the false and misleading January 20, 2000 press release regarding the $50 million in contracts purportedly awarded to the Company, as described in ¶¶ 55–57, *infra*. The press release was issued, as described above, with knowledge or reckless disregard that SCB had not, in fact, been awarded anywhere near $50 million in contracts as represented. The Individual Defendants knowledge of the falsity of their January 20, 2000 statements at the time the press release was issued is evident from the very contracts themselves which detailed the amount of revenue SCB was expected to receive in each specific case. For example, in the case of the ADIS contract, the very terms of the contract revealed that ADIS was merely one of five vendors chosen by ADIS to perform services on a project for which ADIS only had a total authorized budget of $26.3 million. Therefore, when SCB issued the press release the Individual Defendants knew that SCB would likely receive substantially less than the full value of the contract, since they were sharing the work and money with at least four other vendors.

*Id.* ¶ 74.

Reading the allegations in the complaint indicates why this press release does not suffice to support a strong inference of scienter. First, the complaint focuses almost exclusively on the ADIS contract, almost ignoring that the press release mentioned three other contracts. With regard to this contract, moreover, the press release itself makes clear that it was for "up to $26 million." Nothing in the press release represents that SCB had been awarded the entire contract. Plaintiffs' reliance on the July 3 press release represents an attempt to prove "fraud by hindsight," an effort which fails under the PSLRA. *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir.2000); *In re SmarTalk Teles-*

*ervices, Inc. Sec. Litig.,* 124 F.Supp.2d 505, 516 (S.D.Ohio 2000) ("The allegations in the Complaint are, for the most part, an example of pleading fraud in hindsight, the exact type of claims that the Rule 9(b) and the PSLRA were designed to weed out at the pleading stage."). As the court explained in *Novak,* "[c]orporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them. Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Novak,* 216 F.3d at 309 (internal citations omitted). Second, the complaint provides no details relating to the contracts with the telecom company, the university, or the Mississippi Department of Education. Therefore, plaintiffs fail to allege any facts supporting their allegation that the press release was false or misleading when it was made. Indeed, plaintiffs' allegations regarding the telecom contract stem solely from SCB's July press release. As with the ADIS contract, plaintiffs' attempt to plead fraud by hindsight with respect to the telecom contract fails. Third, the complaint does not present any details of the contract with the university. This omission negates the possibility of finding that the press release was materially false or misleading at the time it was made, as the press release did not indicate which contracts would account for what portions of the $50 million. Faced with similar allegations, a court in the Southern District of New York responded as follows:

Plaintiffs allege that defendants should have anticipated that the various contracts announced in [defendant's] press releases would not in fact come to fruition or reap the projected revenues, but plaintiffs cannot simply allege fraud by hindsight. Further, "as long as public

statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects."

*In re Solucorp Indus. Ltd. Sec. Litig.,* No. 98 CIV 3248(LMM), 2000 WL 1708186, at *6 (S.D.N.Y. Nov.15, 2000) (quoting *Novak,* 216 F.3d at 309). In *In re Solucorp,* two press releases supported a strong inference of scienter, yet these press releases differ markedly from SCB's January 20 press release. In the first, the defendant announced that an agreement had been signed, even though it had only entered an agreement in principal. *Id.* at *6. In the second, the defendant "announced without qualifications, the signing of a contract only, months later, to issue a recharacterization that contradicts the previous statement on factual matters that must have been known at the time the original statement was made." *Id.* at *7. In contrast, plaintiffs do not allege that SCB had not signed contracts as of January 20, and the details provided in the July 3 press release presented further details about, but did not contradict, the information presented in the January 20 press release.

Finally, plaintiffs maintain that the individual defendants had a motive and opportunity to engage in fraud, a factor that they contend remains relevant to a scienter inquiry even after *In re Comshare.* Several courts have observed that evidence of motive and opportunity has some relevance in the scienter inquiry, even though such evidence alone cannot support a strong inference of scienter. *See, e.g., Howard v. Everex Sys., Inc.,* 228 F.3d 1057, 1064 (9th Cir.2000); *In re MicroStrategy,* 115 F.Supp.2d at 642; *Chalverus,* 59 F.Supp.2d at 236. In this case, however, none of plaintiffs' other allegations suffice to support a strong inference of scienter. Therefore, *In re Comshare's*

ruling that "claims of motive and opportunity do not, without more, suffice to give rise to a 'strong inference' of scienter" applies directly to this case. *In re Comshare,* 183 F.3d at 553.

As the foregoing analysis and discussion indicates, plaintiffs' complaint fails to allege particular facts that are sufficient to support a strong inference of scienter. Accordingly, SCB and the individual defendants' motions to dismiss the complaint for failure to state a claim under section 10(b) and Rule 10b–5 are granted.

■ In addition to the claims against SCB and the individual defendants under section 10(b) and Rule 10b–5, plaintiffs bring claims against the individual defendants under section 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78t(a). In order to prove a *prima facie* case under section 20(a), a plaintiff must prove a primary violation of federal securities laws and that the targeted defendants (here, the individual defendants) exercised actual power or control over the primary violator (here, SCB). *Howard,* 228 F.3d at 1057; *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 170 (2d Cir.2000). Since plaintiffs fail to state a cause of action against SCB or the individual defendants under Rule 10b–5, there is no primary violation on which a section 20(a) claim can be premised. Therefore, the individual defendants' motion to dismiss the complaint for failure to state a claim under section 20(a) is granted.

With regard to the allegations against E & Y, plaintiffs face a stringent burden to show that E & Y, as an independent auditor, exhibited the degree of recklessness necessary to qualify as scienter. As the Court of Appeals for the Second Circuit explained,

> For recklessness on the part of a non-fiduciary accountant to satisfy securities fraud scienter, such recklessness must be conduct that is highly unreasonable, representing an extreme departure from the standards of ordinary care. It must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company.

*Rothman v. Gregor,* 220 F.3d 81, 98 (2d Cir.2000) (internal quotations and citations omitted); *see also Reiger v. Price Waterhouse Coopers LLP,* 117 F.Supp.2d 1003, 1008 (S.D.Cal.2000) (noting that "the lack of a rational economic incentive for an independent accountant to participate in fraud, the client's central role in providing information to the accountant, and the complex professional judgment required to perform an audit, make it exceedingly difficult for a securities plaintiff to plead facts suggesting that an independent accountant acted with the deliberate state of mind now required to withstand a motion to dismiss").

■ As stated above, a failure to follow GAAP alone cannot sustain a securities fraud claim; rather, plaintiffs "must prove that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *In re Worlds of Wonder,* 35 F.3d at 1426. When plaintiffs are able to identify specific, highly suspicious facts and circumstances of which the auditor was aware at the time of the audit, and the complaint alleges that these facts were deliberately or recklessly ignored, however, GAAP and GAAS violations are relevant to show an auditor's scienter. *In re SmarTalk,* 124 F.Supp.2d at 515–16; *In re Comshare,* 183 F.3d at 553.

Plaintiffs premise their contention that E & Y acted with scienter on three grounds. First, they argue that E & Y represented that the fiscal year 1998 and 1999 financial statements conformed with GAAP, despite the presence of GAAP violations in these financial statements. Second, plaintiffs contend that E & Y had full access to SCB's records, including the contracts with PRI and Quest that led to the allegedly improper revenue recognition, yet E & Y nonetheless certified the financial statements. Third, plaintiffs allege that SCB produced several "red flags" that should have alerted E & Y to the possibility of fraudulent accounting. Specifically, they focus on the indictment and settlement relating to SCB's allegedly fraudulent billing in its contract with the TVA and SCB's refusal to follow E & Y's recommendations pertaining to SCB's financial statements.

■ To support their first ground for establishing that E & Y acted with scienter, plaintiffs allege that the magnitude and obviousness of SCB's accounting errors allow for a strong inference that E & Y's audit transcended mere negligence and represented either a disregard of the obvious errors or a refusal to identify the fraud. Despite plaintiffs' allegations, however, the court reaches the same conclusion with regard to E & Y and the accounting violations as it reached with SCB and the individual defendants: the complaint does nothing more than allege violations of GAAP, which cannot alone establish scienter.

■ Generally speaking, the magnitude of an erroneous financial statement caused by allegedly fraudulent representations, without more, cannot sustain a finding that an auditor acted with scienter. *Reiger*, 117 F.Supp.2d at 1013. This court finds the analysis presented in *Reiger* persuasive: "[t]o avoid undermining the policies of the [PLRSA] through reliance on hindsight and speculation, a court should not infer an independent accountant's scienter based solely on the magnitude of its client's fraud." *Id.* Instead, the magnitude of the fraud can only support an inference of scienter when a plaintiff "pleads other specific and detailed facts showing that the magnitude either enhanced the suspiciousness of specifically identified transactions or made the overall fraud glaringly conspicuous." *Id.; In re SmarTalk*, 124 F.Supp.2d at 517 (noting that "the nature and extent of the errors may create an inference of negligence on the part of the auditor, but absent allegations of specific and suspicious facts and circumstances, no inference of recklessness can be drawn"). This position accords with the requirements Congress set forth through the enaction of the PSLRA. Similarly, the alleged obviousness of accounting errors fails to support a strong inference of scienter. *Duncan v. Pencer*, No. 94 CIV 0321(LAP), 1996 WL 19043, at *10–11 (S.D.N.Y. Jan.18, 1996) (refusing to allow violations of GAAP or GAAS to support a securities fraud violation without corroborating allegations of fraudulent intent). As the court explained in *Duncan,*

> To hold otherwise would obviate the scienter requirement. Plaintiffs would be able to satisfy this requirement merely by alleging that a particular statement was severely false. This result, by requiring theoretical considerations of how false is severely false and how great a departure from a particular accounting standard is a gross departure, would ignore the reality that scienter and falsity are distinct elements of a Section 10(b) claim.

*Id.* at *10. The Sixth Circuit expressed similar sentiments in *In re Comshare:*

> The failure to follow GAAP is, by itself, insufficient to state a securities fraud

claim. While Plaintiffs claim Defendants were aware of, or were recklessly indifferent to the revenue recognition errors, they allege no facts to show that Defendants knew or could have known of the errors, or that their regular procedures should have alerted them to the errors sooner that they actually did. Rather, their allegations rest on mere information and belief, and cannot support a strong inference of scienter.

*In re Comshare*, 183 F.3d at 553 (internal quotations and citations omitted).

■ As plaintiffs correctly point out, the magnitude and obviousness of accounting errors have helped establish an inference of scienter in several cases. *See In re MicroStrategy*, 115 F.Supp.2d at 651 (stating that "the magnitude and pervasiveness of MicroStrategy's financial restatements and the relative simplicity of the accounting principles violated ... lend further probative weight to Plaintiff's allegations that the GAAP violations in this case raise a strong inference of scienter"); *In re Baan*, 103 F.Supp.2d at 21 (noting that the magnitude of a GAAP violation may play a role in supporting an inference of scienter); *Carley Capital Group v. Deloitte & Touche, L.L.P.*, 27 F.Supp.2d 1324, 1339 (N.D.Ga.1998) ("While alleging a misapplication of [GAAP] standing alone is insufficient, such allegation when combined with a drastic overstatement of financial results can give rise to a strong inference of scienter."); *Rehm v. Eagle Fin. Corp.*, 954 F.Supp. 1246, 1256 (N.D.Ill.1997) (observing that "the magnitude of reporting errors may lend weight to allegations of recklessness where defendants were in a position to detect the errors"). In each of these cases, however, the defendants had an extensive role in the management of a corporation for which they worked or for which they served as auditors, or significant red flags existed.

In *In re MicroStrategy*, the court found four factors that supported a strong inference of scienter on the part of the independent accountants: 1) the magnitude of the GAAP and GAAS violations and the subsequent restatement of financial records; 2) the auditor's access to the defendant corporation's resources and knowledge of its operations and business arrangements; 3) the auditor's disregard of red flags signaling improper revenue recognition; and 4) the auditor's violation of its obligation to remain independent and its motive to maintain its client's appearance of profitability. 115 F.Supp.2d at 651–56. With regard to the magnitude of the accounting errors, moreover, the court emphasized that the errors led to false financial reports of net income aggregating to $18.9 million during the class period, whereas MicroStrategy actually had net losses of $36.8 million during the relevant time frame, and that the company and its auditor were able to review the company's financial records, detect the accounting irregularities, and announce the need for a financial restatement within two weeks of an article alerting them to the errors. *Id.* at 651–52.

Similarly, although the court in *In re Baan* stated that "violations [of GAAP] involving the premature or inappropriate recognition of revenue suggest a conscious choice to recognize revenue in a manner alleged to be improper, and may therefore support a stronger inference of scienter," 103 F.Supp.2d at 21, the court ultimately concluded that "plaintiffs do not rely exclusively on the alleged GAAP violations themselves to establish an inference of scienter." *Id.* at 22. Instead, the defendants, corporate executives rather than independent auditors, were involved in the company's daily management and had made statements suggesting they knew or had reason to know of the company's im-

proper practices, the complaint alleged an intentional fraudulent scheme requiring the participation of the corporate defendants, and the defendants had engaged in insider trading. Each of these factors contributed to the inference of scienter. *Id.* at 22–23.

*Carley Capital Group* is also distinguishable, as the court determined that the independent auditor was heavily involved in the management of its client and had unrestricted access to its financial records and data. 27 F.Supp.2d at 1339. Therefore, unlike the relationship between E & Y and SCB, the auditor in *Carley Capital Group* was "not just an auditor." *Id.; see also In re MicroStrategy,* 115 F.Supp.2d at 654–56 (emphasizing that "the Complaint alleges that, by agreeing to sell MicroStrategy's products and to serve as a consultant with regard to those products, PwC [auditor] took on a vested interest in the performance and profitability of the Company beyond that related to a desire to be paid for its auditing services"). Furthermore, the plaintiffs in *Carley Capital Group* alleged that the defendant specifically directed its client to include revenue from a contract that could not be performed in the quarter in which it was recorded. *Carley Capital Group,* 27 F.Supp.2d at 1334.

Finally, in *Rehm,* the court stated that "the magnitude of reporting errors may lend weight to allegations of recklessness where defendants were in a position to detect the errors." 954 F.Supp. at 1256. In *Rehm,* the defendants included the corporation and its executive officers, not

independent auditors, and the court identified several other bases to support an inference of scienter.[10] *Id.*

As the subsequent discussion indicates, however, no such highly suspicious facts or circumstances exist in this case, and the complaint fails to allege that E & Y had a role in SCB's management. Furthermore, unlike the case in *In re MicroStrategy,* the accounting irregularities were not fully known until three months after SCB's employees raised concerns, and the restatements did not transform the company from operating profitably to operating at a loss. Accordingly, plaintiffs cannot rely on the magnitude and obviousness of the accounting errors to support a strong inference that E & Y acted with scienter.

To the extent that *In re MicroStrategy, In re Baan, Carley Capital,* or *Rehm* hold that the magnitude or obviousness of accounting errors alone can support a strong inference that an independent auditor acted with scienter, this court declines to follow their lead. Doing so would eviscerate the principle that accounting errors alone cannot justify a finding of scienter and would require speculation that the PSLRA prohibits. *See Reiger,* 117 F.Supp.2d at 1013 ("Inferring scienter from the magnitude of fraud invites a court to speculate as to the existence of specific (but unpled and unidentified) warning signs that show the accountant acted with scienter. To travel from magnitude of fraud to evidence of scienter, the court must blend hindsight, speculation and conjecture to forge a tenuous chain of

**10.** Specifically, the court noted,: "As a second basis for scienter, plaintiff Rehm claims that since credit losses were the 'defining characteristic' of [defendant company] Eagles' loan servicing business, defendants' contention that the additional $5 million provision for credit losses was 'unexpected' is simply not credible. Plaintiff also makes a third argument that defendants' attempts to mollify public doubt about Eagle's financial health by putting an optimistic and reassuring spin on otherwise damaging credit loss reports, shows that defendants acted with knowledge of Eagle's deteriorating earnings." *Rehm,* 954 F.Supp. at 1256.

inferences."); *In re SmarTalk*, 2000 WL 1781677, at *9 (rejecting attempts to establish scienter though the magnitude and nature of accounting errors as too general and too speculative); *Cheney v. Cyberguard Corp.*, No. 98–6879–CIV–GOLD, 2000 WL 1140306, at *12 (S.D.Fla. July 31, 2000) (finding that allegations concerning the obviousness of accounting errors simply restated GAAP violations); *see also Zucker v. Sasaki*, 963 F.Supp. 301, 308 (S.D.N.Y.1997) (holding that plaintiff failed to establish scienter where plaintiff's "allegations refer simply to violations of basic auditing principles without reference as to how [auditor's] violations were the result of intentional deceit or how they rise to the level of recklessness").

■ Plaintiffs' second ground to support a strong inference of scienter focuses on E & Y's access to SCB's contracts and documents that allegedly revealed improper revenue recognition. The complaint addresses this contention as follows:

As SCB's auditor, E & Y knew of and reviewed the significant contracts and leasing arrangements SCB purportedly entered into during the Class Period and for which SCB was recognizing revenue, including, but not limited to those referred to in ¶ 70, *supra,* concerning Quest and [PRI]. Because of its review of these contracts and the terms contained therein, E & Y knew or recklessly disregarded that SCB was improperly, and in violation of GAAP, recognizing material amounts of revenues prior to the reporting periods during which recognition would be appropriate. E & Y knowingly or recklessly disregarded its responsibility to be particularly suspect of revenue being recognized on contracts purportedly entered into at or near the end of a reporting period. In fact the AICPA's "Audit Risk Alert—1998–1999" states that:

Auditors should be alert for significant unusual or complex transactions, especially those that occur at or near the end of a reporting period. Also suspect are high volumes of revenues recognized in the last few weeks—or days—of a reporting period.

Moreover, the Audit Risk Alert warned that:

In addition to understanding the client's normal terms of sale, the auditor should read and understand contracts related to those significant transactions that are unusual or complex. In some entities, the majority of revenues are comprised of complex transactions evidenced by individual contracts. In these circumstances, the need for the auditor to read and understand individual contract terms may be increased.

E & Y therefore knew or recklessly disregarded that it had to be particularly vigilant regarding the Company's revenue recognition practices by carefully reviewing the terms of significant contracts and paying particular attention to contracts purportedly entered into at or near the end of reporting periods, As illustrated by the examples in ¶ 70, E & Y did neither and knowingly or recklessly allowed SCB to improperly record material amounts of revenues.

(Compl.¶ 93.)

Like plaintiffs' first basis for inferring scienter, these allegations fail to support a strong inference of scienter. *See Reiger,* 117 F.Supp.2d at 1010–1012. The *Reiger* court's response to the nearly identical allegations made by the plaintiffs before it is equally applicable to the present case:

Plaintiffs contend Altris [the audited corporation] furnished Price Waterhouse [the independent auditor] with specific documentation facially revealing that Altris had recognized revenue in violation

of GAAP, which shows that Price Waterhouse consciously disregarded Altris' improper revenue recognition.

The Court finds Plaintiffs' argument—that because Price Waterhouse had access to Altris' contract files, it must have known of the GAAP violations—wholly without merit. The [PSLRA] does not permit district courts to speculate as to the existence of unpled and unidentified facts that could raise a strong inference of scienter. Plaintiffs invite the Court to speculate that Price Waterhouse (1) closely reviewed the documents provided by Altris, (2) discovered the GAAP violations contained therein, then (3) deliberately chose to ignore them. Plaintiffs plead no facts to support this inferential chain beyond Price Waterhouse's possession of documents which would lead a reasonable accountant to discover its client's fraud. This argument invites too much speculation to satisfy either the particularity or strong inference requirements of the [PSLRA].

*Id.* at 1011–12 (internal citations omitted). For the same reasons, plaintiffs cannot sustain their burden by arguing that because E & Y had access to the contracts revealing improper recognition of revenue yet nonetheless certified the financial statements as being in conformity with GAAP, it deliberately ignored the violations and effectively performed no audit at all. Although these allegations may support a finding of negligence, they fail to support a strong inference of scienter.

An examination of the allegations in plaintiffs' complaint with respect to E & Y further indicates why the allegations fail. As discussed above in connection with plaintiffs' causes of action against SCB and the individual defendants, with the possible exception of the PRI and Quest contracts, the complaint fails to state the underlying facts with sufficient particularity to satisfy the PSLRA's requirements. Furthermore, the details surrounding the contracts involving PRI and Quest remain murky at best, and plaintiffs' allegations that E & Y had access to the contracts fail to support a strong inference of scienter.

As an initial matter, any reliance on the corrections SCB made in its Amended 1999 Form 10–K is prohibited, as a restatement fails to provide an inference of scienter. Indeed, plaintiffs' basing their contentions that the PRI and Quest contracts evinced blatantly obvious GAAP violations on the corrections made in the Amended 1999 Form 10–K, rather than on the documents themselves, suggests an attempt to plead fraud by hindsight, an approach that the PSLRA prohibits.

In addition, the complaint does not present the terms or details of the underlying transactions involving PRI and Quest. *See Reiger*, 117 F.Supp.2d at 1012 n. 6 (noting that because plaintiffs failed to attach any of the contract documents that allegedly facially revealed violations of GAAP to their complaint or their opposition to the motion to dismiss, "the Court cannot assess whether the improper contingencies in these transactions ensued from glaringly obvious flaws on the face of the contract documents, or from a combination of omissions and obscure terms"). Instead, they present selected aspects of the transactions and simply allege how, in hindsight, SCB's treatment of the contracts constituted accounting errors. With regard to the PRI contracts, multiple elements were involved in the contracts, and aside from plaintiffs' reliance on the Amended 1999 Form–K, it remains unclear how the multiple elements of the contracts were so clear that E & Y's neglecting to find the accounting errors would rise to the level of recklessness. Similarly, for the Quest contract, it is entirely possible that E & Y

relied on SCB's representations that the contracts existed. Although such reliance may have been negligent, it fails to rise to the level of recklessness necessary to support an inference of scienter.

In *In re MicroStrategy*, plaintiffs made allegations against the independent auditors, PwC, that are similar to the present allegations against E & Y. The court allowed the allegations to contribute to an inference of scienter because plaintiffs emphasized the close working relationship between the company and the auditor, and the auditor allowed the company to recognize revenue from "watershed" contracts that it reviewed, even though those contracts revealed on their face that they had not been duly executed. *In re MicroStrategy*, 115 F.Supp.2d at 652–53. In reaching its conclusion, however, the court made clear that the complaint went far beyond general allegations:

> Specifically, the Complaint alleges that PwC 'had access to the Company's key personnel, accounting books and records and transactional documents, including licensing agreements, at all relevant times,' and otherwise maintained a pervasive presence at the Company. Again, these allegations, by themselves, would not be enough to raise a strong inference of scienter, for such allegations are insufficiently concrete to support such an inference. Yet these allegations do not stand alone or exist in a vacuum; they provide important information on the context in which PwC conducted its audits of MicroStrategy's financial reports and assisted in the preparation of other public statements ... To be sure, the mere fact that PwC had access to MicroStrategy does not mean that it was aware of the alleged fraud at the Company. But it is equally apparent that the greater PwC's access to and involvement with MicroStrategy's operations, the more support an infer-

ence of scienter takes on. Put another way, the alleged nature and level of PwC's access to MicroStrategy serve as the lens through which PwC's specific GAAS and GAAP violations must be viewed. In this regard, the Complaint's allegations that PwC affirmatively reviewed the purported NCR, Primark, and Exchange agreements, yet allowed the Company to recognize revenues from these agreements before they were signed, illuminate important aspects of PwC's role in and knowledge of these GAAP violations and the inferences to be drawn from PwC's violations of GAAS.

*Id.* at 653 (internal quotations and citations omitted). The court concluded that PwC's failure to realize that revenue should not be recognized on contracts that had not been duly executed "raises an inference of scienter." *Id.* Significantly, however, additional factors in *In re MicroStrategy* that are absent from the present case combined to support a strong inference of scienter. Most importantly, the court emphasized that by helping to promote MicroStrategy's products, PwC had violated the GAAS requirement that auditors remain independent from their clients:

> By violating the GAAS requirement of independence, PwC has weakened its ability to rely on its reputation in countering as "irrational" allegations that it participated in a client's fraud, for it is that very reputation that an allegation of lack of independence questions. Moreover, that PwC clearly would have received concrete benefits, through its partnership with MicroStrategy, from certifying and maintaining the Company's allegedly false and misleading financial reports lends more weight to a stronger inference of scienter.

*Id.* at 655–56. These differences make *In re MicroStrategy* clearly distinguishable from this case.

 Finally, plaintiffs allege that the aforementioned "red flags" should have alerted E & Y to the need to scrutinize SCB's statements with extra care. When plaintiffs allege the existence of specific facts that should put defendants on notice of errors in recognizing revenue or indicate reasons to question managements' representations, defendants' refusal to react to the "red flags" can support a strong inference of scienter. *In re Comshare,* 183 F.3d at 553 (noting that plaintiffs failed to allege any specific facts that would constitute red flags for defendants); *In re Health Mgmt.,* 970 F.Supp. at 203 (finding strong inference of scienter where defendants ignored red flags). In order to justify a strong inference of scienter, however, the "red flags" must be closer to "smoking guns" than to mere warning signs. *Reiger,* 117 F.Supp.2d at 1012 (distinguishing cases where "red flags" existed on the ground that they "included specific facts suggesting the independent accountant consciously entertained doubts about the veracity of its client's financial disclosures, either from a client of third party informing the accountant of the client's fraud, or from contemporaneous statements made by the accountant"); *see, e.g., In re SmarTalk,* 2000 WL 1781677, at *11–12 (finding red flag when complaint alleged that defendant, independent auditor, had informed client that it was reconsidering its positions concerning client's prior financial statement but told plaintiff's accountant that it was comfortable with those financial statements); *In re Ikon Office Solutions, Inc. Sec. Litig.,* 66 F.Supp.2d 622, 629 (E.D.Pa.1999) (finding red flag

when accountant's file contained a handwritten note that client's management had told accountant that an employee was "cooking the books"); *In re Health Mgmt.,* 970 F.Supp. at 202–03 (finding red flag when accountant possessed a letter from an analyst warning that client had improperly inflated its accounts receivable); *In re First Merchants Acceptance Corp. Sec. Litig.,* No. 97 C 2715, 1998 WL 781118, at *6, *11 (N.D.Ill. Nov.4, 1998) (finding red flags existed when independent auditor had knowledge of a 220 percent increase in bad debt write-offs despite only a 20 percent increase in bad debt reserves, dramatic increases in the rate of delinquencies approaching the 90 day write-off limit, a 39–fold increase in the dollar value of loans more than 61 days overdue from previous year, and other similar changes). In contrast, allegations that an independent auditor possessed documents that would have revealed improper revenue recognition if they had been properly reviewed pursuant to GAAP and GAAS, only "raise an inference of gross negligence, but not fraud." [11] *Reiger,* 117 F.Supp.2d at 1012. Similarly, a plaintiff cannot establish scienter by arguing that an independent auditor ignored a client's lack of internal controls, failed to exercise additional scrutiny despite knowing its client had reasons to engage in fraudulent accounting due to its need to raise additional financing and desire to locate an acquirer or merger partner, and neglected to investigate obvious and easily discoverable fraud. *Cheney,* 2000 WL 1140306, at *12 (holding that "these 'red flags' are insufficient to support a strong inference of scienter" and emphasizing that plaintiff never alleged that independent auditor was told about its client's fraudulent revenue recognition policy).

---

11. For this reason, plaintiffs' allegations that E & Y had access to SCB's contracts in which the improper revenue recognition appeared, analyzed above as a potential independent grounds supporting an inference of scienter, does not constitute a red flag.

Plaintiffs' first allegation of a red flag relates to the settlement between SCB and the TVA, and a guilty plea entered by one of its employees in connection with this incident, Steven White. The Complaint addresses this "red flag" as follows:

> E & Y knew that SCB and certain of the most senior members of its management had been implicated in connection with a phony billing scheme relating to a contract between the [TVA] and SCB, triggering the issuance of federal grand jury subpoenas and an SEC inquiry concerning SCB. E & Y also knew that the Company settled the matter by paying $1.6 million to the TVA and the U.S. government and that Steven White, a former officer and director of SCB, pled guilty to a felony charge relating to the TVA matter.

(Compl. ¶ 6.) In announcing the settlement in an August 28, 1998 press release, Bryant explained the situation and SCB's response as follows:

> It is important to understand that the TVA engagement was completely over two and a half years ago when we were still a private, closely held company. SCB has since undergone a thorough review of its contract procedures and implemented new controls designed to improve the administration of our contracts and compliance with their terms. These measures include instituting a formal code of conduct and compliance program and designing a corporate compliance officer, strengthening our employee training, and establishing a quality as-

surance program. Thankfully, we have closed this chapter in our company's history and believe we have emerged from the process as a stronger company.

*Id.* ¶ 37. Plaintiffs contend that despite Byrant's statement, "the magnitude of the Company's settlement of the TVA matter, as well as the fact that SCB management approved of a $1.8 million severance package to Mr. White, were further indications, known or recklessly ignored by E & Y, that SCB's managements' representations could not be taken at face value." *Id.* ¶ 92.

The circumstances surrounding the TVA settlement and White's indictment and guilty plea, however, fail to serve as a red flag. Mere knowledge of the investigation, settlement, and guilty plea does not raise a strong inference that E & Y acted with extreme recklessness in performing its audit.[12]

■ First, SCB terminated the individual who pled guilty. Plaintiffs emphasize that White received a severance package, yet this fact alone fails to demonstrate why E & Y should have been suspicious of SCB's management. In fact, SCB's Form 10–K/A, dated September 25, 1998, specified that the severance package was in no way a reward for or an incentive to keep quiet about fraudulent conduct at SCB:

> Steve N. White resigned from his positions as an officer and director of the Company and its subsidiaries effective September 4, 1998. In connection with such resignation, the Company paid

12. Plaintiffs emphasize that Statement of Accounting Standards No. 82, also referred to in the AICPA Professional Standards as AU § 316, lists a "known history of securities laws violations or claims against the entity or its senior management alleging fraud or violations of securities laws" as a "risk factor" relating to possible fraudulent financial reporting that auditors should consider. (Pl.'s Mem.Opp. to E & Y's Mot. to Dismiss at 15.) Given the other circumstances surrounding the TVA investigation, however, this standard alone does not make the TVA investigation a red flag. Even if E & Y failed to comply with the standard, that would at most allow for a finding of negligence, but it would not, in light of SCB's disclosures and actions regarding the TVA investigation, constitute severe recklessness necessary to support a strong inference of scienter.

Mr. White (i) $270,000 to repurchase all of his Common Stock options, (ii) $250,000 for Mr. White's agreement not to sell any shares of Common Stock for one year and not to sell more than 100,000 shares of Common Stock in any 30–day period in the second year, and (iii) $285,000 for a release of any and all claims against the Company. In addition, the Company and Mr. White entered into a Noncompetition, Confidentiality, and Nondisparagement Agreement pursuant to which Mr. White has agreed, among other things, not to compete with the Company for a period of five years, pursuant to which he received a payment of $980,000.

(1998 Form 10–K/A, E & Y's Mot. to Dismiss, Ex. E.) [13]

Second, Bryant's statement provided an assurance that SCB implemented additional internal controls in response to the situation. Plaintiffs allege nothing other than the innocuous payment to White to suggest that E & Y should have treated Bryant's statement with skepticism or that E & Y was aware of any problems following Bryant's announcement. .

Third, the investigation was concluded prior to the issuance of E & Y's fiscal year 1998 and 1999 audits. *Cf. In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F.Supp.2d 290, 295 (S.D.N.Y.1999) (finding that investigations of the practices of independent auditor's client during the year the audit was performed, among other factors, served as red flags supporting a strong inference of scienter). In *In re*

*Oxford Health Plans,* the New York State Insurance Department ("NYSID") conducted an investigation and found that the independent auditor's client's internal controls and accounting practices were deficient in the year the audit occurred and proceeded to fine the client for regulatory violations. *Id.* at 295. Additionally, the New York Attorney General's Office was actively investigating the client for complaints that it had not paid its health care providers in the year the audit occurred. *Id.* Despite these and other red flags,[14] the independent auditor reaffirmed the accuracy of its earlier audits even after it was determined that client's premium revenue and health care services expense were misstated by hundreds of millions of dollars. *Id.*

Finally, SCB publicly disclosed the circumstances surrounding the TVA investigation and the settlement in its filings with the SEC. (Compl.¶ 93.) This disclosure tends to negate an inference that might be drawn from the TVA investigation that SCB was acting with scienter, thereby precluding the incident from serving as a red flag for E & Y. *In re Worlds of Wonder,* 35 F.3d at 1425.

▮ Plaintiffs' second example of a red flag—SCB's refusal to record E & Y's recommended adjustments to its financial statements—also fails to support a strong inference that E & Y acted with scienter. Most importantly, the relevant provisions of GAAS indicate that E & Y's response to SCB's refusal to record the proposed ad-

---

**13.** Since the court may take judicial notice of documents filed with the SEC, reference to SCB's 1998 Form 10–K/A does not constitute consideration of materials outside of the Complaint that would transform the motion to dismiss into a motion for summary judgment. *Jackson v. City of Columbus,* 194 F.3d 737, 745 (6th Cir.1999); *Lovelace,* 78 F.3d at 1018.

**14.** The other red flags in *In re Oxford Health Plans* included the following allegations: the client's computer accounting system could not keep track of basic information and Oracle, a consulting firm, advised the client to stop inputting accounting background information into the computer system because the system could not handle additional functions. 51 F.Supp.2d at 295.

justments was within the bounds of its discretion. Specifically, GAAS provides that auditors must require companies to eliminate any material misstatements, and if the company refuses to do so, the auditor must include appropriate disclosures in its audit opinion. *See Codification of Statements on Auditing Standards,* AU § 312. GAAS recognizes, however, that "[t]he auditor's consideration of materiality is a matter of professional judgment." *Id.* at AU § 312.10. Accordingly, when an auditor concludes that a company's financial statements are not materially misstated, the auditor has no duty to add any disclosures to the audit opinion even if the company does not make recommended changes to its financial statements. *Id.* at AU § 312.

Plaintiffs allege that E & Y's proposed adjustments for fiscal year 1998 included $135,000 in overstated revenues and $79,500 in understated expenses, (Compl.¶ 33(e)), and that its proposed adjustments for fiscal year 1999 included $75,000 in overstated revenues and $441,500 in understated direct costs and expenses. *Id.* § 49(g). In approaching these figures, E & Y compares the overstated revenue and understated expenses to the total recorded revenue and the total expenses for fiscal years 1998 and 1999. (Def. E & Y's Mem.Supp.Mot. to Dismiss at 14–15.) This comparison reveals that the proposed adjustments constituted 0.123 percent of fiscal year 1998 revenue, 0.39 percent of fiscal year 1998 total expenses, 0.04 percent of fiscal year 1999 revenue, and 0.2 percent of total costs and expenses. *Id.* at 14–15. In contrast, plaintiffs compare the net difference be-

tween the total revenues and expenses to the reported net income for fiscal years 1998 and 1999. (Pl.Mem.Opp. to Def. E & Y's Mot. to Dismiss at 17–18.) This comparison reveals that the net income for fiscal year 1998 was overstated by 1.7 percent, and the net income for fiscal year was overstated by 7.5 percent.[15] *Id.* at 17–18. The possibility of reaching such different results based on which approach one takes to analyze the magnitude of the proposed adjustments indicates that reasonable minds can differ on whether the misstatements were material. Accordingly, the complaint fails to allege facts from which one could infer that E & Y was acting with scienter rather than pursuant to its professional discretion in treating its recommendations as immaterial. *See In re Software Toolworks, Inc. Sec. Litig.,* 789 F.Supp. 1489, 1508–09 (N.D.Cal.1992), aff'd in part and rev'd in part on other grounds, 50 F.3d 615 (9th Cir.1994); *Lovelace,* 78 F.3d at 1021 (noting that GAAP is "a term of art encompassing a wide range of acceptable procedures, such that 'an ethical, reasonably diligent accountant may choose to apply any of a variety of acceptable accounting principles when that accountant prepares a financial statement' ") (quoting *Godchaux v. Conveying Techniques, Inc.,* 846 F.2d 306, 315 (5th Cir.1988)). The conclusion reached by the district court in *Software Toolworks* is equally applicable to the present case:

> Deloitte [the independent auditor] had earlier determined that the Craftsman deal was improperly recorded, and approached Toolworks to make an adjustment to reverse the revenue booked on

**15.** Although plaintiffs also discuss the effects of the proposed restatements on the fourth quarter results for fiscal years 1998 and 1999, (Pl.'s Mem.Opp. to Mot. to Dismiss at 17–18), E & Y correctly replies that its audit was for the fiscal years, not for individual quarters.

(Def. E & Y's Mem.Supp. Reply Supp.Mot. to Dismiss at 17.) Accordingly, this court does not consider the impact the proposed adjustments would have had on the fourth quarters of fiscal years 1998 and 1999.

this sale. When Toolworks refused, Deloitte posted an entry for the entire amount of the revenue recognized on this sale to its Schedule of Adjustments Passed. Deloitte then analyzed its aggregate passed adjustments and concluded that they did not have a material affect on the March 31, 1990 Financial Statement taken as a whole. This is precisely what Deloitte was supposed to do under [GAAS].

*Software Toolworks,* 789 F.Supp. at 1508–09. The court concluded as follows: "Every audit results in a certain number of passed adjustments which are not disclosed; these adjustments are passed as immaterial and accordingly require no disclosure. There is no indication that Deloitte did anything but follow this procedure in good faith." *Id.* at 1509. Similarly, plaintiffs have produced no evidence that E & Y acted in bad faith in treating the proposed adjustments as immaterial. Therefore, SCB's refusal to record the proposed adjustments does not constitute a red flag that should have alerted E & Y to the need for more careful scrutiny of SCB's financial statements.

Plaintiffs' reliance on the Second Circuit's decision in *Ganino* does not alter this analysis. In *Ganino,* the court addressed whether the complaint before it satisfied the materiality requirement of Rule 10b–5. 228 F.3d at 161–68. Pursuant to this requirement, a plaintiff must allege that defendant made "a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Id.* at 161. The court rejected the district court's use of a benchmark figure to determine whether the defendant's misrepresentation was material, ruling instead that "[m]ateriality is determined in light of the circumstances existing at the time the alleged misstatement occurred." *Id.* at 165. Significantly, however, the court was not addressing

whether an auditor acted with scienter. Instead, the case involved statements that a corporate defendant made to purchasers of its stock. *Id.* at 158. Nothing in the opinion suggests that the same standards govern whether a corporate defendant's statements were material under Rule 10b–5 and whether an auditor's proposed adjustment would be material under GAAS, thereby allowing a finding that the auditor's refusal to record the passed adjustments could indicate scienter. Furthermore, the heightened standards for finding that an independent auditor acted with scienter were not before the court, and the defendant was not entitled to the professional discretion that auditors possess. Equally important, *Ganino* addressed the very difference of opinion that separates plaintiffs from E & Y in the present case—whether changes in financial statements' earnings should be compared against net income, as plaintiffs advocate, or net revenues, as E & Y supports. *See id.* at 164–65. The court responded to defendants' position that the erroneously included fees ("Fees") should be compared to total revenue rather than total income as follows: "the defendants challenge the assertion that the Fees went directly to [defendant company's] bottom line as income, a factual dispute that cannot be resolved without further development of the record." *Id.* at 165. Unlike *Ganino,* however, where the plaintiffs' complaint "alleged that the Fees were 'pre-tax income (revenue for which there was no corresponding expense)' and repeatedly compared the Fees to the 'Net Income' line item on the Form 10Qs," *id.* at 164–65, plaintiffs' complaint addresses the impact of SCB's refusal to record the proposed adjustments in terms of the overstated revenues, understated expenses, understated direct costs, and understated selling, general and administrative expenses, (Compl.¶¶ 33(e), 49(g)), and then

considers the impact that these adjustments would have on SCB's net income in combination with other allegedly fraudulent accounting practices for fiscal years 1998 and 1999. *Id.* ¶¶ 34, 50. Accordingly, the different treatment in the complaint further supports a finding that SCB's refusal to record the proposed adjustments fails to establish a red flag that could support a strong inference that E & Y acted with scienter.

In accordance with this discussion, plaintiffs' complaint fails to establish a strong inference that E & Y acted with scienter. Indeed, the court's conclusion in *In re SmarTalk* is equally applicable to the present case: "As to [the independent auditor], there is simply no allegation that supports an inference, let alone a strong inference, that [the independent auditor] acted with a mental state so culpable that it approximates an actual intent to aid in the fraud being perpetrated by the audited company or that the danger was so obvious that any ordinary person would have been aware of the Company's fraud." *In re SmarTalk,* 124 F.Supp.2d at 516. As a result, E & Y's motion to dismiss for failure to state a claim under section 10(b) and Rule 10b–5 is granted.

For the reasons discussed above, defendants' motions to dismiss are granted in their entirety. This case is dismissed with prejudice.

IT IS SO ORDERED.