Kevin **SMITH**, et al. **Plaintiffs.**

v.

**CIRCUIT CITY STORES, INC.,** et al. **Defendants.**

No. CIV.A.3:02CV 25.

United States District Court, E.D. Virginia, Richmond Division.

Feb. 10, 2003.

710

Charles Lewis Williams, Butler, Macon, Williams, P.C., Harris Dewey Butler, III, James Curie Skilling, Butler Williams & Skilling PC, Richmond, VA, Abraham Rappaport, Kenneth Jerome Vianale, Christopher Steven Jones, Milberg Weiss Bershad Hynes & Lerach LLP, Boca Raton, FL, Guri Ademi, Ademi & O'Reilly, Cudahy, WI, Barrett Erskine Pope, Wyatt B. Dur-

rette, Jr., DurretteBradshaw PLC, Richmond, VA, Marc A. Topaz, Schiffrin & Barroway LLP, Bala Cynwyd, PA, Howard K. Coates, Jr., Cauley Geller Bowman & Coates, LLP, Boca Raton, FL, Steven E. Cauley, Cauley Geller Bowman & Coates, LLP, Little Rock, AR, for Plaintiffs.

Edward Joseph Fuhr, Stacy Marie Colvin, Eric Harrison Feiler, Hunton & Williams, Richmond, VA, for Defendants.

### MEMORANDUM OPINION

SPENCER, District Judge.

This matter is before the Court on Defendants' Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint. For the reasons discussed below, Defendants' Motion is GRANTED.

### I.

On September 18, 2002, Plaintiffs filed their Consolidated Amended Complaint ("Complaint"). The relevant class period is from June 15, 2001 to June 17, 2002. Plaintiffs' first allege that the Defendants fraudulently concealed the true cost associated with Circuit City's abandonment of leased facilities when it exited the appliance business (the "lease claim"). Specifically, Plaintiffs allege that the $17.8 million loss reserve established by the Company for its lease impairment costs should have been set at $27.8 million. Second, Plaintiffs allege that the Defendants failed to disclose the existence and contribution of the Company's finance operation to the Company's overall performance (the "finance operation claim"). Circuit City's finance operation provides financing for purchases of Circuit City retail products and also services Visa and MasterCard accounts.

Until recently, Circuit City Stores, Inc.'s business operations had two key components: consumer electronics and automobile sales. Circuit City operates CarMax Auto Superstores through certain of its subsidiaries. Until October 2002, a CarMax tracking stock was available on the open market. This stock, which traded under the ticker symbol "KMX," was intended to track the performance of the CarMax operations exclusively, and was unrelated to and unaffected by the performance of the Circuit City stores or the Circuit City stock. On June 14, 2001, before the class period, Circuit City filed a registration statement with the SEC announcing the issuance of additional shares of CarMax tracking stock. Circuit City issued these shares for sale to the public in the second quarter of fiscal year 2002. CarMax separated from Circuit City on October 1, 2002, and became an independent, publicly-traded company.

On July 25, 2000, Circuit City announced its plans to exit the appliance business and expand its selection of key consumer electronics and home office products in all Circuit City Superstores. In exiting the appliance business, Circuit city closed eight distribution centers and eight service centers in fiscal years 2001 and 2002, which it was leasing on a long-term basis. Circuit City continued to pay the long-term leases and suffered losses in periods when it could not sublease the properties or when it subleased the properties at rates below the lease rate.

When Circuit City announced its exit from the appliance business in 2000, they projected costs of $17.8 million related to the recently abandoned long term lease properties. Circuit City based this projection on prevailing economic conditions, expected period of vacancy for the properties, anticipated sublease rate and ability to sublease the properties, and estimated costs such as tenant allowances, real estate taxes, and insurance payments.

On February 22, 2002, Circuit City made two press releases announcing: (1) its plan

to separate CarMax from Circuit City, making CarMax an independent, publicly-traded company; (2) that it spent $52 million to remodel and relocate a portion of its Superstore base in fiscal year 2002, and would spend an additional $130 million on the same task in fiscal year 2003; (3) that various inventory issues during January and February, 2002 contributed to a slow-down in Circuit City stores' sales growth from its December levels; (4) that it was adjusting its lease impairment costs upward by $10 million; and (5) financial expectations for fiscal year 2003.

The increase in the lease impairment amount resulted from the weakening economy and decreased demand for commercial properties in the previous year. Plaintiffs claim that every Circuit City statement announcing projected lease impairment costs, except the February 22, 2002 statement, was false. Plaintiffs also claim that the $10 million adjustment, announced on February 22, 2002, caused the Company's stock price to fall more than 33%.

Circuit City supports its retail sales of consumer electronics through its finance operation. The finance operation is managed through First North American National Bank ("FNANB"), which provides consumer revolving credit. Essentially, FNANB is Circuit City's in-house credit card operation. At various times the finance operation's portfolio included Visa and/or MasterCard bankcards. The profits have always been recorded as offsets to Circuit City's overall selling, general and administrative expenses. ("SG & A expenses").

FNANB has always been required to file Consolidated Reports of Condition and Income ("Call Report") each calendar quarter with the Federal Deposit Insurance Corporation Board. These filings are always publicly available. The filings detail FNANB's financial condition, including its net income or loss for each particular reporting period. Besides the Call Reports, there are other public sources of information detailing FNANB's performance. First, in each 10–K, and 10–Q Circuit City devoted nearly a full page to data related to its finance operation. Second, the credit card Master Trusts file Form 8–Ks monthly with the SEC that detail the receivable portfolio performance trends of the two credit card master trusts to which FNANB sells its credit card receivable for management purposes. Third, the credit card Master Trusts file a Form S–3 with the SEC each time a public receivable sale is completed. These forms include historical information of the credit card portfolio. Finally, in footnotes to its annual SEC filings, the Company provided additional disclosure of its finance operation.

Particularly through its 10–K, Circuit City detailed the vulnerability of the finance operations' earnings throughout the Class Period. On March 11, 2002 these risks were digested in a Barron's financial magazine article discussing the impact of Circuit City's finance operation on its overall performance. Thomas G. Donlan, *What's In the Box? Calculating Circuit City's Earnings is harder than Understanding the Manual for your VCR*, Barron's, March 11, 2002, at ¶ 6. The article reported that banking, not electronic sales, produced more than half of Circuit City's 2002 profits. The article discussed the great difficulty of determining the profitability of Circuit City's retail segments from its published financial reports.

On May 14, 2002, Circuit City expanded its financial disclosures of the performance of its finance operation. The expanded disclosures spotlighted the extent to which FNANB's earnings offset their overall SG & A expenses for fiscal years 2000, 2001, and 2002. More than half of Circuit City's $353 million in pretax earnings in 2002

stemmed from its finance operation. At this time, the stock price remained steady. On June 18, 2002, Circuit City disclosed the performance of its finance operation for the quarter ended May 31, 2002. During that quarter, $44.3 million of Circuit City's $46.3 million in consolidated pre-tax profits came from its finance operation. Circuit City's stock then fell nearly forty-percent over the next two months. Circuit City notes that its stock fell in lock-step with other companies in their market sector, such as Radio Shack and Best Buy. In addition, retail indices fell in similar fashion.

## II.

Plaintiffs claim that Defendants made fraudulent misrepresentations and omissions in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. As private, class action securities litigation, this Action is governed by the Private Securities Litigation Reform Act of 1995 (the "Reform Act"), 15 U.S.C. §§ 78u–4, 5 (1995). The Reform Act heightened the pleading requirements and the liability protections in private securities fraud actions. *See Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 620 (4th Cir.1999) (finding that the Reform Act "heighten[s] the standard for pleading scienter"); *In re Manugistics Group, Inc. Sec. Litig.*, No. CIV. S 98–1881, 1999 WL 1209509, at *1 (D.Md. Aug. 6, 1999) (finding that the Reform Act imposes "heightened standards of claim pleading, above and beyond ... even the ... specific allegations of fraud required to be pleaded under Rule 9"). The Reform Act has two heightened pleading requirements. First, a Plaintiff claiming securities fraud must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. §§ 78u–4(b)(1). Second, in proving that the defendant acted with a particular state of mind, "the complaint shall, with respect to each act or omission alleged to violate [the laws of securities exchanges], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §§ 78u–4(b)(2). The Court must conduct "an exacting statement-by-statement analysis" to determine whether the complaint meets "the heightened pleading requirements imposed by the Reform Act," *Arnlund v. Smith*, 210 F.Supp.2d 755, 761 (E.D.Va.2002). If the Reform Act's pleadings requirements are not met, the Court must, "on the motion of any defendant, dismiss the complaint." 15 U.S.C. §§ 78u–4(b)(3)(A). The Reform Act was designed to prevent "abusive and meritless lawsuits." H.R. Conf. Rep. No. 104–369, at 31 (1995). It is important to stop this particularly harmful form of predatory litigation at the pleadings stage because "the abuse of the discovery process [imposes] costs so burdensome that it is often economical for the victimized party to settle" if the case proceeds past the pleadings stage. *Id.* at 31–32.

*A. Whether Plaintiffs Plead Facts That Give Rise to a Strong Inference of Scienter as Required by the Reform Act*

The Circuit Courts are split as to the correct standard for pleading scienter under the Reform Act's second heightened pleading requirement. *See Arnlund v. Deloitte & Touche LLP*, 199 F.Supp.2d 461, 472–75 (E.D.Va.2002) (discussing the various standards). When confronted with the issue, the Fourth Circuit and this Court have found that the pleadings failed to meet the most lenient of the standards adopted by the Circuit Courts, which is the Second Circuit standard. *See, e.g., Phillips*, 190 F.3d at 621 (applying the Second

Circuit standard). Under the Second Circuit standard, a complaint must plead "specific facts that either (1) constitute circumstantial evidence of conscious or reckless behavior or (2) establish a motive to commit fraud and an opportunity to do so." *Phillips,* 190 F.3d at 620 (citing *In re Time Warner, Inc.,* 9 F.3d 259, 268–69 (2d Cir.1993)). Defendant argues that Plaintiffs do not offer facts giving rise to a strong inference that Defendant acted consciously or recklessly to defraud investors. In this context, recklessness is defined as an act "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Sanders v. John Nuveen & Co.,* 554 F.2d 790, 793 (7th Cir.1977). Furthermore, "allegations of scienter must be based on a substantial factual basis in order to create a 'strong inference' that the defendant acted with the required state of mind." *Phillips,* 190 F.3d at 621 (quoting *Zeid v. Kimberley,* 973 F.Supp. 910, 918 (N.D.Cal.1997)).

 With respect to the lease claim, Plaintiffs claim generally that "Defendants repeatedly (and recklessly) represented [the initial lease impairment estimate] to investors as accurate." Am. Compl. ¶ 16. Plaintiffs also allege that "at the time each ... forward-looking statement [regarding lease impairment costs] was made, the particular speaker knew that the particular forward-looking statement was false, and/or the [statement] was authorized and/or approved by an executive officer of Circuit City who knew that those statements were false when made." *Id.* at ¶ 127.

In support of their finance operation claim, Plaintiffs state that "Defendants ... knew or recklessly disregarded the fact that adverse facts specified [in the Amend-

ed Complaint] had not been disclosed," *Id.* at ¶ 27, and that Defendants "knew and/or recklessly disregarded the [alleged] falsity and misleading nature of the [challenged statements]." *Id.* at ¶ 132. Plaintiffs also claim "Defendants knew that the public documents and statements, issued ... by ... the Company were materially false and misleading," *Id.,* and that "Defendants had actual knowledge of the [alleged misrepresentations, which] ... were done knowingly and recklessly." *Id.* at ¶ 140. They further claim "Defendants knew and disregarded or recklessly failed to know the facts set forth [in the Amended Complaint]" regarding the finance operation. *Id.* at ¶ 87. Plaintiffs claim that "material adverse information ... was known to or recklessly disregarded by Defendants." *Id.* at ¶ 141. Finally, Plaintiffs simply state that "[D]efendants acted with scienter." *Id.* at ¶ 132.

 These allegations do not "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Defendants must have the "intent to deceive, manipulate, or defraud." *Ernst & Ernst,* 425 U.S. at 193 n. 12, 96 S.Ct. 1375. A "strong inference" is a "persuasive and cogent" inference. *In re MicroStrategy, Inc. Sec. Litig.,* 115 F.Supp.2d 620, 631 (E.D.Va.2000). A strong inference of scienter arises from "facts that, if true, would compel or forcefully suggest that a given defendant acted with the required state of mind." *In re SCB Computer Tech., Inc. Sec. Litig.,* 149 F.Supp.2d 334, 345 (W.D.Tenn.2001). The Reform Act intentionally makes it more difficult for plaintiffs to plead scienter. *Phillips,* 190 F.3d at 620. Adding the words "knowingly" or "recklessly" to a factual statement is insufficient pleading. *See Krim v. Coastal Physician Group, Inc.,* 81 F.Supp.2d at 632, *aff'd per curiam*

201 F.3d 436, 1999 WL 1008975 (4th Cir. 1999). Pleadings that "couple a factual statement with a conclusory allegation of fraudulent intent" are too broad and conclusory under the Reform Act. *Arnlund v. Deloitte & Touche LLP,* 199 F.Supp.2d at 476. Plaintiffs' Complaint fails to "plead specific facts concerning ... when each defendant ... learned that a statement was false, how that defendant learned that the statement was false, and the particular document or other source of information from which the defendant came to know that the statement was false." *In re First Union Corp. Sec. Litig.,* 128 F.Supp.2d 871, 876 (W.D.N.C.2001).

Plaintiffs attempt to plead scienter by referencing the individual Defendants' positions in Circuit City. According to Plaintiffs, Defendants must have acted with scienter because they were senior officers of Circuit City and "were privy to confidential and proprietary information concerning Circuit City." Am. Comp. ¶ 27. Plaintiffs speculate that Defendants obtained this confidential information through "internal corporate documents, conversations and connections with other corporate officers and employees." *Id.* Guesswork of this kind, based on the position of the Defendants is insufficient under the Reform act. *See First Union,* 128 F.Supp.2d at 888 (rejecting "the practice of contending that because of their positions as corporate officers, defendants must have known of the allegedly false and misleading nature of the alleged misstatements").

■ In their final attempt to plead scienter through circumstantial evidence, Plaintiffs claim that because Defendants adjusted their projection of the lease impairment costs from 17.8 to 27.8 million, they must have fraudulently stated the lease impairment costs in their initial projection. Pleading "fraud by hindsight," or Monday morning quarterbacking of this sort, is insufficient pleading under the Reform Act. *First Union,* 128 F.Supp.2d at 888 (noting that pleading fraud by hindsight "has been categorically rejected by numerous courts"); *Hillson Partners Ltd. Partnership v. Adage, Inc.,* 42 F.3d 204, 209 (4th Cir.1994) (holding that "[w]here fraudulent projections are alleged, the plaintiff must ... identify in the complaint with specificity some reason why the discrepancy between a company's optimistic projections and its subsequently disappointing results is attributable to fraud"). Plaintiffs also attempt to support their allegation of scienter by arguing that scienter can be inferred from the short time of forty-five days between Circuit City's issuance of its Form 10–Q quarterly report, which included the original lease impairment projection, and its revision of its projected lease impairment cost. The amount of time between an initial statement and its revision does not alone support an inference of scienter. *See Arnlund v. Deloitte & Touche LLP,* 199 F.Supp.2d at 482 (holding that "pleading temporal proximity alone [does not] adequately establish [a strong inference of] scienter"); *Hillson,* 42 F.3d 204, 215 (4th Cir.1994) ("an inference from timing alone is not sufficient ... to withstand the strict requirements of [the Reform Act] and Rule 9(b)"). Plaintiffs fail to plead specific facts indicating that Defendants engaged in conscious or reckless behavior.

■ Being unable to plead specific facts of conscious or reckless behavior, Plaintiffs must demonstrate scienter by showing that Defendants had motive and opportunity to commit securities fraud. Plaintiffs allege that Defendants' motive to commit securities fraud stemmed from their desire to "(i) protect and enhance their executive positions and the substantial compensation and prestige they obtained thereby; (ii) enhance the value of

their personal holdings of Circuit City common stock and options; [and] (iii) increase their bonuses ..." Am. Compl. ¶ 133. Plaintiffs also allege that two of the three individual Defendants, McCollough and Chalifoux, received increased bonuses in 2002. Evidently, Plaintiffs feel that the receipt of an increased bonus evidences a motive to perpetrate securities fraud in order to obtain the bonus. This circular reasoning, alleging motivations common to all corporate executives, cannot support an inference of scienter. *See, e.g., Phillips,* 190 F.3d at 623 (holding that "allegations [that] pertain to motivations common to every [corporation] ... cannot demonstrate scienter"); *In re Trex Co., Inc. Sec. Litig.,* 212 F.Supp.2d 596, 607 (W.D.Va. 2002) ("desire to increase ... annual bonus" insufficient to establish scienter). Finally, Plaintiffs allege that Defendants sought to inflate the price of Circuit City stock to enhance the value of the CarMax tracking stock sold in a secondary offering in August, 2001. Defendants note that the performance of CarMax stock was unrelated to the performance of Circuit City stock. Thus, Plaintiffs' allegation of motive is without merit. Regardless of whether Plaintiffs could ever prove these factual allegations, a desire to raise the stock price or improve the company's financial position is insufficient to plead a strong inference of scienter. *See Leventhal v. Tow,* 48 F.Supp.2d 104, 115 (D.Conn.1999) (holding that "motive to artificially inflate [a company's] stock price ... in order to get more favorable terms in ... stock-for-stock transactions and in the issuance of the debentures ... is ... insufficient to establish scienter and is routinely rejected by the courts"); *First Union,* 128 F.Supp.2d at 896 ("[i]t is not sufficient ... to plead scienter by alleging an abstract desire to enable the company to continue to enjoy a high stock price and thereby ease the difficulties of raising additional capital").

■ In addition to insufficient allegations of motive, Plaintiffs fail to allege that the individual Defendants sold Circuit City stock during the class period. According to the Fourth Circuit, "[t]o support a claim of motive based on the benefit a defendant derives from an increase in the value of his holding, a plaintiff must demonstrate some sale of 'personally-held stock' or 'insider trading' by the defendant." *Phillips,* 190 F.3d at 622. In fact, Plaintiffs' failure to allege that the Defendants sold stock insulates them from any inference of scienter. *In re SCB Computer Tech., Inc. Sec. Litig.,* 149 F.Supp.2d 334, 351 (W.D.Tenn. 2001) (holding that a failure to allege insider sales "actually negates an inference of scienter"); *In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1425 (9th Cir.1994) (defendants' "minimal sales of stock ... negates an inference of scienter"). Without a sale of personally-held stock or insider trading, the Defendants would not receive any non-legitimate benefit. Thus, an inference of scienter is inappropriate.

■ Finally, Plaintiff's scienter allegations fail for the independent reasons that they did not plead facts giving rise to a strong inference of scienter for each Defendant nor attribute particular statements to each Defendant. Plaintiffs cannot lump Defendants together "without specifically alleging which Defendant was responsible for which act." *Juntti v. Prudential–Bache Sec.,* 993 F.2d 228, 1993 WL 138523 at *2 (4th Cir.1993).

Plaintiffs allegations of scienter fail because they do not sufficiently plead circumstantial facts of conscious or reckless behavior, nor do they establish motive and opportunity. In addition, Plaintiffs fail to plead scienter as to each Defendant. Thus, Plaintiffs have failed to meet the second heightened pleading requirement and their Complaint could be dismissed for this reason alone.

## B. Whether Plaintiffs Plead Facts with Particularity and Disclose the Grounds For Their Fraud Allegations

Under the Reform Act's first heightened pleading requirement, a Plaintiff claiming securities fraud must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. §§ 78u–4(b)(1).

■ In support of their finance operation claim, Plaintiffs state that "Defendants … knew or recklessly disregarded the fact that adverse facts specified [in the Amended Complaint] had not been disclosed." Am. Compl. at ¶ 27. Additionally, that Defendants "knew and/or recklessly disregarded the [alleged] falsity and misleading nature of the [challenged statements]." *Id.* at ¶ 132. Plaintiffs also claim that "Defendants knew that the public documents and statements, issued … by … the Company were materially false and misleading," *Id.,* and that "Defendants had actual knowledge of the [alleged misrepresentations, which] … were done knowingly and recklessly." *Id.* at ¶ 140. They further claim that "Defendants knew and disregarded or recklessly failed to know the facts set forth [in the Amended Complaint]" regarding the finance operation. *Id.* at ¶ 87. Finally, Plaintiffs claim that "material adverse information … was known to or recklessly disregarded by Defendants." *Id.* at ¶ 141.

■ Plaintiffs do not plead their general allegations of fraud with sufficient particularity under Rule 9(b) and the Reform Act. Plaintiffs' allegations are an insufficient basis for fraud because they fail to state "with particularity all facts on which [their] belief is formed." See 15 U.S.C. § 78u–4(b)(1). A plaintiff must provide, in great detail, all the relevant facts forming the basis of their belief. It is not sufficient for a plaintiff's pleadings to set forth a belief that certain unspecified sources will reveal, after appropriate discovery, facts that will validate their claim. Nor is it sufficient to simply plead that Defendants' positions within Circuit City and their reassessment of the lease impairment costs suggests fraud. Plaintiffs' complaint does not include adequate corroborating details. Without specific details, this Court cannot ascertain whether there is any basis for the allegations that the officers had actual or constructive knowledge of Circuit City's problems that would suggest their optimistic representations about Circuit City's health were consciously misleading. Therefore, "we cannot determine whether there is any basis for alleging that the officers knew that their statements were false at the time they were made—a required element in pleading fraud." *See In re Silicon Graphics, Inc. Sec. Litig.,* 183 F.3d 970, 985 (9th Cir.1999) (dismissing securities fraud action that referred only to evidence in "reports" without providing "the sources of … information with respect to the reports, how [plaintiffs] learned of the reports, who drafted them, or which officers received them"). Plaintiffs have not identified any facts, reports or information available to Defendants, or that Defendants received information from any individuals or meetings which would suggest that they had the type of knowledge that would make their misrepresentations consciously misleading.

■ Similarly to Plaintiffs' general allegations of fraud, their allegations of accounting fraud also lack the particularity required by Rule 9(b) and the Reform Act. Plaintiffs allege that Defendants violated four generally accepted accounting principles ("GAAP") and two SEC Regulations. *See* Am. Compl., ¶¶ 35–46. The four rele-

vant generally accepted accounting principles are Statement of Financial Accounting Standards ("SFAS") 131 and 5, and Accounting Principles Board ("APB") Opinions No. 22 and 28. Defendants' Ex. 23, 24, 25, and 26. The two relevant SEC Regulations are S–K and S–X. Plaintiffs repeatedly recite the language of the allegedly applicable standard and then make conclusory allegations that Defendants violated the standard without supporting their claim with citations to documents, meetings, or individuals that may have conveyed information.

First, Plaintiffs fail to plead with particularity that Statement of Financial Accounting Standards ("SFAS") No. 131, *Disclosures about Segments of an Enterprise and Related Information* (Financial Accounting Standards Board, June 1997), applies to Circuit City's financing operation. *See* Am. Compl. ¶¶ 35–46. SFAS 131 requires public companies to report financial information about their reportable operating segments, which are defined as, among other things, segments "whose operating results are regularly reviewed by the [company's] chief operating decision maker." SFAS 131 ¶ 10(b). Plaintiffs simply allege that FNANB's operating results "were regularly reviewed by the Company's Board ... and its chief operating management to make decisions about resources to be allocated to [FNANB]." Plaintiffs cite to no documents, meetings, or individuals in support of this claim. These allegations are not sufficiently particular. *See First Union*, 128 F.Supp.2d at 886.

Second, Plaintiffs' allegations that Defendants violated SFAS No. 5, *Accounting for Contingencies* (Financial Accounting Standards Board, March 1975) fail for the same reasons. SFAS 5 requires a company to accrue a loss contingency by a charge to income if it is probable that a liability has been incurred, and if the

amount of that liability can be reasonably estimated. SFAS 5 ¶ 8(a), (b). Otherwise, disclosure of loss contingencies is still required if there is a "reasonable probability that a loss or an additional loss may have been incurred." *Id.* ¶ 10. Plaintiffs generally recite the language of the standard and allege that "the Company failed to accrue ... lease ... [impairment] costs when such costs were probable and estimable." Am. Compl. ¶ 122. Plaintiffs fail to allege, however, when there was a reasonable possibility that an additional loss may have been incurred or when such a loss was probable and estimable.

Third, Plaintiffs allege that Circuit City violated Item 303 of SEC Regulation S–K, 17 C.F.R. ¶¶ 229.303(a)(1)-(3)(iii) ("S–K 303"). Regulation S–K contains "standard instructions for filing forms under" certain securities laws. 17 C.F.R. § 210. S–K 303 requires disclosure only of "known" trends or uncertainties expected to have a "material" impact on a company's operations. 17 C.F.R. § 229.303(a)(3)(ii). Plaintiffs allege that S–K 303 required the Company to disclose the trend that led it to increase its estimate of lease impairment costs. Plaintiffs do not support their claim with facts suggesting that Defendants knew that any trend existed which was expected to have a material impact on Circuit City prior to their adjustment of the projected lease impairment costs on February 22, 2002.

Fourth, Plaintiffs claim that SEC Regulation S–X, 17 §§ C.F.R. 210 *et seq.*, establishes a presumption that SEC filings not prepared in accordance with GAAP are misleading. An actionable statement under Exchange Act, however, is both misleading and material. *Taylor v. First Union Corp. of South Carolina*, 857 F.2d 240, 243 (4th Cir.1988). As discussed below in Part C, Plaintiffs fail to demonstrate that any of Defendants' alleged misstatements

are material. Therefore, Plaintiffs have insufficiently alleged that Regulation S–X applies to this case.

Fifth, Plaintiffs allege that Defendants violated Accounting Principles Board ("APB") Opinion No. 28. Opinion No. 28 establishes disclosure rules for interim financial statements, such as Form 10–Q quarterly reports filed with the SEC. *See* APB Opinion No. 28, *Interim Financial Reporting* (Accounting Principles Board, May 1973). Plaintiffs allege that Defendants "failed to provide commentary relating to" Circuit City's recognitions of revenue and profits form its finance operation, and other operations, Am. Compl. ¶ 119, in violation of Opinion No. 28, which "encourages management to provide commentary relating to the effects of significant events upon the interim financial results." APB Opinion No. 28. Paragraph 32 of Opinion No. 28, however, provides that the "significant events" that the Opinion covers are limited to "[e]xtraordinary items, gains or losses from disposal of a segment of a business . . ., unusual or infrequently occurring items," and "changes in accounting principles or practices." Plaintiffs allege no facts indicating that Circuit City's recognition of revenue and profits from its finance operation constitutes a significant event under Opinion 28. Defendants note that recognition of revenue from its financing operations is a daily occurrence completely at odds with the definition of a significant event under the Opinion. Therefore, Opinion No. 28 does not apply.

Finally, Plaintiffs allege that Circuit City violated APB Opinion No. 22, which requires disclosure of certain significant accounting policies in a company's financial statements. *See* APB Opinion No. 22, *Disclosure of Accounting Policies* (Accounting Principles Board, April 1972). Plaintiffs claims that Circuit City failed to disclose "the fact that it recognized material amounts of revenue and profits from [its] finance operations." Am. Compl. ¶ 117. Opinion 22, however, requires disclosure only of "significant accounting policies." Plaintiffs do not allege how Circuit City's alleged non-disclosure constitutes a significant accounting policy.

 There are two additional independent reasons why Plaintiffs allegations of accounting fraud are insufficient under the Reform Act. First, Circuit City's "financial statements were audited by independent auditors . . . who provided a clean opinion that the Company's financial statements were fairly presented in accordance with GAAP." *First Union,* 128 F.Supp.2d at 894. Plaintiffs do not challenge Circuit City's auditors' opinions. A failure to challenge the independent auditors' opinions weakens an allegation that a defendant violated GAAP. *See id.* Additionally, when a company's accounting firm "approve[s] the method by which the company [represents its finances]," doubt is "arguably cast[ ] . . . on the existence of any impropriety." *First Union,* 128 F.Supp.2d at 894. Second, the Reform Act's pleading standards are heightened for allegations of GAAP violations. Heightened standards apply because GAAP "is a term of art encompassing a wide range of acceptable procedures." *In re K–tel Int'l, Inc. Sec. Litig.,* 107 F.Supp.2d 994, 999 (D.Minn. 2000), *aff'd* 300 F.3d 881 (8th Cir.2002) (quoting *Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015 (5th Cir.1996)). Thus, Plaintiffs alleging GAAP violations "must plead pertinent facts, . . . demonstrating that the specified accounting principle applies." *Id.* Plaintiffs allegations of GAAP and SEC Regulations discussed above are insufficiently specific under the Reform Act.

 In addition to failing to plead fraud with sufficient particularity, Plaintiffs fail to disclose the sources upon which their allegations are based. Plaintiffs at-

tempt to provide their sources in one paragraph prefacing the Complaint. The paragraph states:

> Plaintiffs allege the following, except as to matters specifically pertaining to them or their counsel, based upon counsel's investigation, which included analysis of publicly-available news articles and reports, public filings with the [SEC] and the Federal Reserve Board, securities analysts reports and advisories, press releases and other matters of public record, contact with factual sources and consultation with a forensic accountant.

*See* Am. Compl., preface. Under the Reform Act, Plaintiffs must disclose the sources upon which they base their allegations. *See First Union*, 128 F.Supp.2d at 888. Plaintiffs disclosure must be particular to allow the Court to evaluate "the sufficiency of [Plaintiffs'] allegations in light of the reliability of the[ir] sources." *First Union*, 128 F.Supp.2d at 884. Courts examine plaintiffs' sources to determine whether the Complaint is legitimate, or the abusive, predatory litigation targeted by the Reform Act. In *First Union*, the Court found insufficient a similar paragraph prefacing the complaint. In that case, Plaintiffs provided:

> a conclusory paragraph on the first page [of the complaint] asserting that [p]laintiffs' accusations [were] based on: (a) a review and analysis of [First Union's SEC filings]; (b) interviews with former employees of First Union; (c) review and analysis of securities analysts' reports concerning First Union; (d) review and analysis of First Union press releases and reports and articles about First Union ... in the financial and general press; (e) review and analysis of other publicly available information about First Union; (f) review and analysis of First Union financial statements and reports; and (g) consultation with certified public accountants.

*First Union*, 128 F.Supp.2d at 889 (citing other courts which held similar source disclosure inadequate under the Reform Act). The *First Union* Court held that Plaintiffs' insufficient source disclosure compelled "dismissal of the entire Amended Complaint." *Id.* Courts routinely refuse to accept Plaintiffs' word that there is a sufficient basis for their Complaint. Therefore, dismissal of the Amended Complaint is proper for this reason alone.

### C. Whether Defendants' Alleged Omissions are Immaterial

Defendants argue that their alleged failure to promptly disclose the increased projected lease impairment costs was immaterial as a matter of law. The materiality of a statement or omission is based on the magnitude of the event to which the statement or omission is related, and the magnitude of the event is measured "in light of the totality of the company activity." *Hillson Partners Ltd. Partnership v. Adage, Inc.*, 42 F.3d 204, 219 (4th Cir.1994) (citing 2 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 13–5 at 90–91 (2d ed.1990)). In *Hillson Partners*, the Court held immaterial a statement that was only misleading as to 0.5 percent of a company's total revenues. Similarly, in *First Union*, the Court found immaterial a misstatement related to 2.1 percent of operating earnings. Regardless of how this Court measures Circuit City's "total activity," the omission of the increased lease impairment costs was immaterial. The ten million dollar omission was 0.01 percent of Circuit City's $9.59 billion in total revenue for the fiscal year ending February 28, 2002. *See* Defendants' Ex. 1, 10–K at 61. Alternatively, $10 million, net of tax related benefits, is 3.25 percent of Circuit City's $191 million in net earnings for fiscal year 2002. *See id.* Circuit Courts routinely find immaterial misstatements or omissions of this

magnitude. *See Glassman v. Computervision Corp.*, 90 F.3d 617, 633 (1st Cir.1996) (omitted information of 3 to 9 percent of actual revenues was immaterial); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1427 (3d Cir.1997) (increase of costs by 0.2 percent immaterial); *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir.1997) (overstatement of assets by 2 percent was immaterial); *SCB Computer Tech., Inc.*, 149 F.Supp.2d at 351 (misstatement of revenue between 1.65 and 2.9 percent insufficient to create strong inference of scienter). Therefore, any misstatement of the lease impairment costs was immaterial.

 In addition, any late disclosure by Defendants of the scope of their finance operation was immaterial because the relevant information was already publicly available. An omitted fact is material only "if there is a substantial likelihood that a reasonable purchaser or seller of a security ... would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." *Longman v. Food Lion, Inc.*, 197 F.3d 675, 682–83 (4th Cir.1999). Disclosure of information already publicly available does not materially alter the "total mix" of available information. *See Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256, 1262–63 (4th Cir.1993) (disclosure of company's fiscal problems by third parties in newspaper article and analyst's report "more than cured any omission by [the company]"). Substantial information about the relationship between Circuit City and its finance operation FNANB was available to Plaintiffs. First, in each Form 10–K, Circuit City identified FNANB as a subsidiary. Defendants' Ex. 1, 10–K at 21. Second, Circuit City disclosed additional information about FNANB's performance in its quarterly 10–Qs, monthly 8–K filings, and the filing of S–3s on the issuance of new public securitizations. Third, outside of Circuit City, an analyst reported in great detail on FNANB's impact on Circuit City's earnings. The analyst noted that "Circuit City's credit earnings consistently account for about one-third of pre-tax income," and that Circuit City's credit card programs had "contributed 28–42% of [Circuit City's] pre-tax earnings over the past few years." Ursula H. Moran, *Circuit City; Two–Thirds Retailer and One–Third Bank*, Sanford C. Bernstein Research Call, October 3, 2000 at 1, Defendants' Ex. 30. Ms. Moran reported that FNANB had been "a significant contributor to the company's bottom line, and will continue to be an important growth factor." *Id.* at 2. She also noted that "[o]ver half of credit assets are VISA and MasterCard receivables." *Id.* She estimated that "the impact of [Circuit City's] credit business ... has consistently lowered [Circuit City's selling, general and administrative expenses] by 100–150 basis points." *Id.* at 3. Ms. Moran also highlighted the risk factors associated with FNANB's operations. Specifically, she described Circuit City's bank business as "deep within the sub-prime category." *Id.* at 8. In addition, the October 16, 2000 issue of Consumer Electronics discussed Moran's report. *See Circuit Cites Credit Cards*, Consumer Electronics, Oct. 16, 2000, Defendants' Ex. 31. Thus, FNANB's role within Circuit City was known well before publication of the Barron's article in March 2002 or Circuit City's statement in May 2002. Another analyst noted that the Barron's article "highlited facts that were already recognized by most sophisticated Circuit City investors." John Dahl, *CC Provides Additional Disclosure on Its Credit Business; Upping Our Price Estimate*, Jefferies & Company, Inc., May 14, 2002, Defendants' Ex. 32. Since the information about FNANB was available prior to the class period, Circuit City's omission was immaterial.

## D. Additional Grounds for Dismissal

■ There are two additional grounds for dismissal of Plaintiff's Amended Complaint. The first relates to Plaintiffs' finance operation claim. Plaintiffs claim that they were induced to buy stock by the market's artificial stock price. As in any fraud claim, Plaintiffs must demonstrate reliance, which in this type of claim takes the form of reliance on the market. Essentially, Plaintiffs are claiming "fraud on the market." *See Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256, 1261 (4th Cir. 1993). Under this theory, the market sets the stock price based on available information. *See id.* This theory of fraud is fatal to Plaintiffs here because the market price is presumed to have internalized all publicly available information. *See Raab v. General Physics Corp.*, 4 F.3d 286, 289 (4th Cir.1993). Plaintiffs claim fails if the market had access to the supposedly incriminating information. *Connelly v. Gen. Med. Corp.*, 880 F.Supp. 1100, 1116 (E.D.Va. 1995). As discussed above, the scope and role of Circuit City's finance operation was publicly available well before the class period begins. The market is presumed to have reflected this available information. Therefore, Plaintiff's fraud on the market theory fails.

■ Second, Defendants argue that their statements about lease impairment costs were forward-looking. Forward-looking statements are protected under the Reform Act's Safe Harbor provision. A forward-looking statement is a statement concerning "a projection of . . . financial items." 15 U.S.C. § 78u–5(i)(1). "A statement . . . whose truth or falsity is discernible only after it is made" is necessarily forward-looking. *Harris v. Ivax Corp.*, 182 F.3d 799, 805 (11th Cir.1999). Circuit City's lease statements were for future costs. The accuracy of those statement could only be verified after they were made. Thus, the lease statements were

forward-looking. The Reform Act's safe harbor protects forward-looking statements that are either accompanied by cautionary language, immaterial, or made without actual knowledge of their falsity. *See* 15 U.S.C. § 78u–5(c)(1). Being immaterial, Circuit City's forward-looking statements are protected under the Reform Act. Additionally, Circuit City cautioned that "undue reliance should not be placed on any forward-looking statements, which are based on current expectations." *See* Circuit City Stores, Inc. Form 10–Q for quarter ended May 31, 2001 (filed July 6, 2001), at 15, Defendants' Ex. 36. Thus, Circuit City's forward-looking statements merit safe harbor on at least two bases: immateriality and use of cautionary language.

## E. Dismissal of Plaintiffs' Section 20(a) Claims

Plaintiffs allege that the individual Defendants violated Section 20(a) of the Exchange Act, which imposes liability on those who "control" those who are primarily liable under the Act. 15 U.S.C. § 78–t(a). Since Circuit City is not guilty of a primary violation under the Exchange Act, any secondary claims under Section 20(a) must also fall. *See Longman,* 197 F.3d at 686 (holding that there is no Section 20(a) liability without a primary violation).

## F. Leave to Amend

■ This Court does not permit Plaintiffs to further amend their Amended Complaint. The Reform Act "does not contemplate amending complaints," it sets "a high standard of pleading which if not met results in mandatory dismissal." *Champion Enter., Inc. Sec. Litig.*, 145 F.Supp.2d 871, 872 (E.D.Mich.2001). The Reform Act could not meet its purpose to "provide a filter at the earliest stage (the pleading stage) to screen out lawsuits that have no factual basis" if plaintiffs "were

allowed to amend and amend until they got it right." *Id.* at 873, 877. Only dismissal of insufficient complaints without leave to amend preserves the teeth of the Reform Act.

### III.

The Private Securities Litigation Reform Act sets a high bar for pleading securities fraud. The pleading standards are deliberately demanding to eliminate abusive litigation. *See* H.R. Conf. Rep. No. 104–369 at 31 (1995). Plaintiffs' Complaint falls short of the Reform Act's standards. Therefore, Defendants' Motion to Dismiss the Consolidated Amended Complaint is GRANTED, and Plaintiffs' request for leave to amend is DENIED.

The Court will issue an appropriate Order.

### *FINAL ORDER*

This matter is before the Court on Defendants' Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint. For the reasons discussed in the accompanying Memorandum Opinion, Defendants' Motion is GRANTED. Plaintiffs' request for leave to amend is DENIED.

Let the Clerk send a copy of this Order and the Memorandum Opinion to all counsel of record.

It is SO ORDERED.